CHARLES MILLER, ESQ.
SBN: 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

Admission *Pro Hac Vice* to be Sought for:

MICHAEL E. HEYGOOD,
Texas Bar No. 00784267
ERIC D. PEARSON,
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorney for Plaintiffs**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| ANTHONY LEOCADIO, MARK FRANEY, JOHN JORDAN, ET AL., | ) ) ) ) | CASE NO. _____ |
| Plaintiffs | ) ) |  |
| vs. | ) ) | **COMPLAINT AND JURY DEMAND** |
| FCA US LLC; and FIAT CHRYSLER AUTOMOBILES N.V., | ) ) ) |  |
| Defendants. | ) ) |  |

-1-

## I.       INTRODUCTION

Plaintiffs allege the following against auto manufacturer/distributor FCA US LLC and its corporate parent Fiat Chrysler Automobiles N.V. (together, "Fiat Chrysler" or "Defendants"); based where applicable on personal knowledge, information and belief, and the investigation of counsel.

## II.       NATURE OF THE ACTION

1.       This action relates to the Fiat Chrysler's promotion and sale of EcoDiesel® branded diesel-powered light trucks and SUVs.  Defendants advertised these vehicles as offering efficient fuel economy, desirable performance, and clean, environmentally friendly emissions. In reality, these vehicles, like the well-known Chrysler diesel vehicles, were equipped with a software algorithm—a "defeat device"—designed to cheat and avoid federal and state emission testing for oxides of nitrogen, and thereby deceiving the Environmental Protection Agency ("EPA") and other regulators, including state regulators, into approving for sale hundreds of thousands of non-compliant vehicles.

2.       The defeat device consists of software installed on engine management systems that detect when the vehicle is undergoing emissions testing versus driving on the road.  The defeat devices adjust the functioning of the vehicles' sophisticated emissions controls to ensure that they would pass emissions testing. At other times, except when undergoing emission testing, these vehicles emit vastly more harmful pollutants than federal and state law allow.

3.       Defendants promised low-emission, environmentally friendly vehicles with strong fuel economy and performance. Consumers believed and relied on these representations and, as a result, bought and leased over 100,000 EcoDiesel® vehicles.  All the while, these consumers were unwittingly among the highest polluters on the road, despite having paid a premium for

purportedly clean vehicles.  Defendants' warranties, advertising, and other statements about the vehicles' legal compliance, cleanliness, and environmental friendliness are patently false and misleading.  These vehicles are hereinafter referred to as "Vehicles" or "Fraudulent Vehicles."

4.      On January 12, 2017, the EPA revealed and acknowledged Defendants' deceit and issued a Notice of Violation to Defendants for violations of the Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

5.      Also on January 12, 2017, the California Air Resources Board (CARB) issued a Notice of Violation to Defendants after detecting "auxiliary emissions control devices" in EcoDiesel® vehicles.  The CARB announcement noted that the Defendants failed to disclose these devices, which "significantly increase" NOx emissions when activated.

6.      Plaintiffs are individuals and businesses who purchased or leased a Fraudulent Vehicle in the United States. The Vehicles include the 2014–2016 Ram 1500 pickup truck and the 2014–2016 Jeep Grand Cherokee SUV when equipped with Fiat Chrysler's 3.0-liter EcoDiesel® engine.

7.      Defendants induced and tricked Plaintiffs into purchasing or leasing the Fraudulent Vehicles, which violate the Clean Air Act (among other laws) and, on top of that, do not perform as represented. Plaintiffs would not have purchased or leased the Fraudulent Vehicles had they known the truth of Defendants' fraudulent scheme and misrepresentations.  In fact, no one would or could have purchased any of the Fraudulent Vehicles if not for Defendants' fraud. This is because the EPA Certificates of Compliance that rendered them legal to sell in the United States were obtained only by deception.

-3-

8.     Plaintiffs have suffered, and continue to suffer, economic damages due to the dramatic diminution in value of their Vehicles, which pollute the environment at levels far in excess of the legal limits and cannot pass required emissions tests without cheating.

9.     To the extent the Fraudulent Vehicles can be repaired or retrofitted to pass federal and state emission requirements, they will, absent a full and comprehensive compensation program by Defendants, continue to suffer in diminution in value and cause economic loss. This is because any repairs or retrofits will reduce mileage per gallon and cause the Fraudulent Vehicles to suffer lower performance, durability, and reliability, thereby reducing market value and increasing the cost of ownership and operation.

10.     Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq. ("RICO")), Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq. ("MMWA")), common law fraud, contract, warranty, unjust enrichment, and consumer protection laws.

11.     Plaintiffs seek monetary damages, restitution, pollution mitigation, and injunctive and other equitable relief. In addition, Plaintiffs are entitled to a large award of punitive or exemplary damages because Defendants deliberately, and with malice, deceived Plaintiffs for years.

### III.     PARTIES

**A.     Plaintiffs**

**California Plaintiffs**

12.     Plaintiff Anthony Leocadio is a citizen of California residing in Orange County, California.  Mr. Leocadio leased a new 2014 Dodge Ram 1500 EcoDiesel truck from McPeek's Dodge of Anaheim in Anaheim, Orange County, California.

-4-

13.     Plaintiff Mark Franey is a citizen of California residing in San Bernadino County, California.  Mr. Franey purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Victorville Motors, Inc. in Victorville, San Bernadino County, California.

14.     Plaintiff John Jordan is a citizen of Florida residing in Santa Rosa County, Florida.  Mr. Jordan leased a new 2016 Dodge Ram 1500 EcoDiesel truck from Surf City Auto Group in Huntington Beach, Orange County, California.

**Alabama Plaintiffs**

15.     Plaintiff Anthony Conti is a citizen of Alabama residing in Jefferson County, Alabama.  Mr. Conti purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Jim Burke in Birmingham, Jefferson County, Alabama.

16.     Plaintiff Davis Williams is a citizen of Alabama residing in Jefferson County, Alabama.  Mr. Williams purchases a new 2015 Dodge Ram 1500 EcoDiesel truck from Jim Burke in Birmingham, Jefferson County, Alabama.

**Arizona Plaintiffs**

17.     Plaintiff Joseph Sandavol is a citizen of Nevada residing in Clark County, Nevada.  Mr. Sandavol purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Planet CDJ in Flagstaff, Coconino County, Arizona.

**Colorado Plaintiffs**

18.     Plaintiff Kevin Warren is a citizen of Kansas residing in Sedgwick County, Kansas.  Mr. Warren purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Johnson Auto Plaza in Brighton, Madison County, Colorado.

**Florida Plaintiffs**

19.     Plaintiff Robert Longboat is a citizen of Florida residing in Pinellas County, Florida.  Mr. Longboat purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Dayton Andrews Dodge in St. Petersburg, Pinellas County, Florida.

20.     Plaintiff Stephen Kotula is a citizen of Florida residing in Okeechobee County, Florida.  Mr. Kotula purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Napleton Northlake Chrysler in Lake Park, Palm Beach County, Florida.

**Georgia Plaintiffs**

21.     Plaintiff Kathleen Hodges is a citizen of Georgia residing in Emanuel County, Georgia.  Ms. Hodges purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Georgia CDJ in Statesboro, Bulloch County, Georgia.

22.     Plaintiff Paul Wages is a citizen of Georgia residing in Fulton County, Georgia. Mr. Wages purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Landmark Dodge in Morrow, Clayton County, Georgia.

**Hawaii Plaintiffs**

23.     Plaintiff Justin Fagala is a citizen of Virginia residing in Prince William County, Virginia.   Mr. Fagal purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Cutter CJD in Pearl City, Honolulu County, Hawaii.

**Idaho Plaintiffs**

24.     Plaintiff Scott Bennett is a citizen of Idaho residing in Madison County, Idaho. Mr. Bennett purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Lithia CJD in Pocatello, Bannock County, Idaho.

**Illinois Plaintiffs**

25.     Plaintiff Michael Butzen is a citizen of Illinois residing in Cook County, Illinois. Mr. Butzen purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Sherman Dodge in Skokie, Cook County, Illinois.

26.     Plaintiff Jason Smith is a citizen of Illinois residing in Peoria County, Illinois. Mr. Smith purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Sam Leman in Peoria, Peoria County, Illinois.

27.     Plaintiff Howard Purdue is a citizen of Illinois residing in Morgan County, Florida.  Mr. Purdue purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Green Dodge in Springfield, Sangamon County, Illinois.

**Indiana Plaintiffs**

28.     Plaintiff David Smith is a citizen of Indiana residing in Madison County, Indiana. Mr. Smith purchased a new 2014 Jeep Grand Cherokee from Ed Martin in Anderson, Madison County, Indiana.

29.     Plaintiff Sheila Landes is a citizen of Indiana residing in Parke County, Indiana. Ms. Landes purchased a used 2014 Jeep Grand Cherokee from York Chrysler Dodge Jeep in Crawfordsville, Montgomery County, Indiana.

**Kentucky Plaintiffs**

30.     Plaintiff Scotty Adams is a citizen of Kentucky residing in Estill County, Kentucky.  Mr. Adams purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Glenn Freedom Dodge in Lexington, Fayette County, Kentucky.

31.     Plaintiff Kathy Gillan is a citizen of Georgia residing in Fayette County, Georgia. Ms. Gillan purchased a used 2015 Dodge Ram 1500 EcoDiesel truck from Swope Mitsubishi Hyundai in Radcliff, Hardin County, Kentucky.

32.     Plaintiff Harold Basham is a citizen of Indiana residing in Vanderburgh County, Indiana.  Mr. Basham purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Audubon Chrysler in Henderson, Henderson County, Kentucky.

**Kansas Plaintiffs**

33.     Plaintiff Brian Schneider is a citizen of Kansas residing in Sedgwick County, Kansas.  Mr. Schneider purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Eddy's CDJ in Wichita, Sedgwick County, Kansas.

**Louisiana Plaintiffs**

34.     Plaintiff Mark Savana is a citizen of Louisiana residing in Ouachita Parish County, Louisiana.  Mr. Savana purchased a used 2014 Dodge Ram 1500 EcoDiesel truck from Interstate Dodge in West Monroe, Ouachita Parish County, Louisiana.

**Nevada Plaintiffs**

35.     Plaintiff William Blackwell is a citizen of Texas residing in El Paso County, Texas.  Mr. Blackwell purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Towbin Dodge in Henderson, Clark County, Nevada.

36.     Plaintiff Joseph Noone is a citizen of Nevada residing in Clark County, Nevada. Mr. Noone purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Chapman Dodge in Las Vegas, Nye County, Nevada.

**New York Plaintiffs**

37.     Plaintiff John Barone is a citizen of New York residing in Putnam County, New York.  Mr. Barone purchased a used 2014 Dodge Ram 1500 EcoDiesel truck from Meadowland Chrysler Dodge in Carmel, Putnam County, New York.

38.     Plaintiff John Hansen is a citizen of New York residing in Putnam County, New York.  Mr. Hansen purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Meadowland Chrysler Dodge in Carmel, Putnam County, New York.

**North Carolina Plaintiffs**

39.     Plaintiff James Hedgecock is a citizen of North Carolina residing in Brunswick County, North Carolina.  Mr. Hedgecock leased a new 2016 Dodge Ram 1500 EcoDiesel truck from Neuwirth Motors in Wilmington, New Hanover County, North Carolina.

**Ohio Plaintiffs**

40.     Plaintiff Kenneth Malott is a citizen of Indiana residing in Morgan County, Indiana.  Mr. Malott purchased a used 2015 Dodge Ram 1500 EcoDiesel truck from Fred Martin Superstore in Baberton, Summit County, Ohio.

**Oklahoma Plaintiffs**

41.     Plaintiff Mary Branch is a citizen of Oklahoma residing in Osage County, Oklahoma.  Ms. Branch purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Bartlesville Dodge in Bartlesville, Washington County, Oklahoma.

42.     Plaintiff Michele Rodriguez is a citizen of Oklahoma residing in Oklahoma County, Oklahoma.  Ms. Rodriguez purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Auto Max Dodge in Shawnee, Pottawatomie County, Oklahoma.

43.     Plaintiff Ronnie Williams is a citizen of Oklahoma residing in Tulsa County, Oklahoma. Mr. Williams purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Dick Bailey Motors in Okmulgee, Okmulgee County, Oklahoma.

**Texas Plaintiffs**

44.     Plaintiff Jeremiah Brown is a citizen of Texas residing in Jefferson County, Texas.  Mr. Brown purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Cowboy CDJ in Silsbee, Hardin County, Texas.

45.     Plaintiff Marion Lathem is a citizen of Texas residing in Dallas County, Texas. Mr. Lathem purchased a new 2017 Dodge Ram 1500 EcoDiesel truck from Clay Cooley Dodge in Irving, Dallas County, Texas.

46.     Plaintiff Jerry Pettijohn is a citizen of Texas residing in Erath County, Texas.  Mr, Pettijohn purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Bayer Enterprises in Hamilton, Hamilton County, Texas.

47.     Plaintiff Nathan Pope is a citizen of Texas residing in San Jacinto County, Texas. Mr. Pope purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from DeMontrond Auto Group in Conroe, Montgomery County, Texas.

48.     Plaintiff Claud Aldridge is a citizen of Texas residing in Denton County, Texas. Mr. Aldridge purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Meador Dodge in Fort Worth, Tarrant County, Texas.

49.     Plaintiff Elizabeth Lewis is a citizen of Texas residing in Smith County, Texas. Ms. Lewis purchased a new 2014 Dodge Ram 1500 EcoDiesel truck from Dodge City in McKinney, Collin County, Texas.

50.     Plaintiff Mike McCutchen is a citizen of Texas residing in Sterling County, Texas.  Mr. McCutchen purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from All American Chrysler Jeep Dodge in San Angelo, Tom Green County, Texas.

**Utah Plaintiffs**

51.     Plaintiff Mary Black is a citizen of Utah residing in Wasatch County, Utah.  Ms. Black purchased a used 2016 Dodge Ram 1500 EcoDiesel truck from Ken Garff Dodge in West Valley, Salt Lake County, Utah.

52.     Plaintiff Dave Kinsinger is a citizen of Utah residing in Summit County, Utah.  Mr. Kinsinger purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Karl Malone Dodge in Heber City, Wasatch County, Utah.

53.     Plaintiff Orlan Wallace is a citizen of Utah residing in Uintah County, Utah.  Mr. Wallace purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Larry H. Miller Dodge in Sandy, Salt Lake County, Utah.

54.     Plaintiff Dustin O'Dell is a citizen of Colorado residing in Weld County, Colorado.  Mr. O'Dell purchased a new 2016 Dodge Ram 1500 EcoDiesel truck from Layton Hills CDJ in Layton, Davis County, Utah.

**Virginia Plaintiffs**

55.     Plaintiff Linda Vargas is a citizen of Virginia residing in Virginia Beach County, Virginia.  Ms. Vargas purchased a new 2016 Jeep Cherokee Diesel from Southern DCJ in Norfolk, Norfolk City County, Virginia.

**Wisconsin Plaintiffs**

56.     Plaintiff Freddie Steinhilber is a citizen of Wisconsin residing in Clark County, Wisconsin.  Mr. Steinhilber purchased a used 2014 Dodge Ram 1500 EcoDiesel truck from Chrysler World in Abrams, Oconto County, Wisconsin.

**Wyoming Plaintiffs**

57.     Plaintiff Shannon Boutain is a citizen of Wyoming residing in Natrona County, Wyoming.  Mr. Boutain purchased a new 2015 Dodge Ram 1500 EcoDiesel truck from Freemont Dodge in Casper, Natrona County, Wyoming.

**B.     Defendants**

58.     FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is owned by holding company Fiat Chrysler Automobiles N.V. ("Fiat"), a Dutch corporation headquartered in London, United Kingdom. FCA was formed upon the acquisition of American automaker Chrysler by Fiat (through its Italian corporate predecessor, Fiat S.p.A.). FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

59.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA and its predecessor, Chrysler, are and were known as one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

60. Fiat Chrysler Automobiles N.V. ("Fiat"), the corporate parent of FCA, also owns numerous European-based automotive brands in addition to FCA's American brands. Through subsidiary FCA Italy, these include Italian-based brands including Alfa Romeo, Fiat automobiles, Fiat Professional, Lancia, and Abarth. Fiat also owns Ferrari and Maserati. As of as of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

61. Fiat also owns several manufacturers of automotive parts, including diesel-engine manufacturer VM Motori. VM Motori developed and manufactured the "EcoDiesel®" engines at issue in this suit. Between 2000 and 2007, as now, VM Motori shared a corporate parent with the Chrysler brand, because it was owned wholly or partly by then-Chrysler owner DaimlerChrysler AG. DaimlerChrysler sold its stake in VM Motori in 2007. By the start of 2011, 50% of VM Motori was owned by General Motors and 50% by Penske Corporation. In early 2011, Fiat purchased Penske's 50% stake in VM Motori, and in October 2013, Fiat acquired the remaining 50% from General Motors.

62. Fiat, through its subsidiary FCA, designs, manufactures, markets, distributes, and sells two models of vehicle for which the EcoDiesel® option is available: the Ram 1500 and the Jeep Grand Cherokee. The EcoDiesel® engine is a 3.0-liter V6 diesel engine developed by VM Motori.

63. Fiat Chrysler, through its various entities, designs, manufactures, markets, distributes, and sells automobiles in California and multiple other locations in the U.S. and worldwide. Fiat Chrysler and/or its agents designed, manufactured, and installed the EcoDiesel® engine systems in the Fraudulent Vehicles. Fiat Chrysler also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Fraudulent Vehicles.

64.     Fiat Chrysler's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. Fiat Chrysler is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States. The dealers act as FCA's agents in selling the Fraudulent Vehicles and disseminating information about the Fraudulent Vehicles to customers and potential customers.

65.     At all relevant times, Defendants manufactured, distributed, sold, leased, and warranted the Fraudulent Vehicles under the Fiat Chrysler brand name throughout the United States. Defendants also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Fraudulent Vehicles.

## IV.     JURISDICTION AND VENUE

66.     Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.  Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this case because Plaintiffs have asserted claims under the Magnuson - Moss Act seeking damages in excess of $50,000 exclusive of interest and costs (15 U.S.C. §§ 2301, et seq.).  Therefore, Plaintiffs' claims arise under the laws of the United States.

67.     The Court has personal jurisdiction over Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce in California numerous diesel trucks and SUVs, including the diesel trucks and SUVs at issue in this case.  In addition, the fraudulent statements, breaches of contract, and breaches of

warranty at issue in this case occurred, in part, in this district.  Defendants also conduct business in California and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in California.  Defendants' contacts with California were continuous and systematic.

68.     Venue is proper in this District because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.  Defendants have conducted extensive business in this District, including, without limitation, marketing, advertising, selling, and leasing the Fraudulent Vehicles in this district.

## V.       FACTUAL BACKGROUND

### A.     The Defeat Device Scheme

69.     On January 12, 2017, the EPA and CARB announced to the world that Defendants, just like Volkswagen, had violated the Clean Air Act through an emissions cheating scheme in an attempt to reap profits at the expense of the environment and the confidence of its own customers.

70.     The EPA's Notice of Violation of the Clean Air Act alleges that Defendants installed and hid engine management software in light-duty model year 2014, 2015 and 2016 Jeep Grand Cherokees and Ram 1500 trucks with 3.0-liter diesel engines sold in the United States. The undisclosed software allows for increased emissions of nitrogen oxides (NOx) from the Fraudulent Vehicles.

71.     In announcing the Notice of Violation, Cynthia Giles, Assistant Administrator for EPA's Office of Enforcement and Compliance Assurance, said: "Failing to disclose software that affects emissions in a vehicle's engine is a serious violation of the law, which can result in harmful pollution in the air we breathe."  She further noted that the EPA will "investigate the

nature and impact of these devices. All automakers must play by the same rules, and we will continue to hold companies accountable that gain an unfair and illegal competitive advantage."

72.     Through its own testing at the National Vehicle and Fuel Emissions Laboratory, the EPA discovered eight undisclosed Auxiliary Emission Control Devices ("AECDs"). These devices were not disclosed in Defendants' applications for certificates of conformity (COCs), which designates approved vehicles for sale in the United States.  Defendants knew disclosure was required under applicable regulations, yet did not disclose the existence of these devices.

73.     The mere existence of these AECDs leaves Defendants in violation of Section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), for each and every time a Fraudulent Vehicle was sold, offered for sale, introduced into commerce, or delivered for introduction into commerce or imported.

74.     There are over 100,000 vehicles on the roads of the United States that are affected by Defendants' fraudulent scheme.

75.     EPA testing indicates that at least some of these devices "appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emissions standards," as opposed to during "normal operation and use."  This is the definition of a defeat device, which is designed to pass lab certification tests but expel more emissions in the real world in order to achieve greater fuel economy or performance.

76.     Defendants' scheme is strikingly similar to that of Volkswagen.  In the aftermath of Volkswagen's scandal, the EPA announced that it would conduct additional testing of vehicles on the market "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for purposes of investigating a potential defeat device." This testing led to the discovery of Defendants' fraudulent scheme.

77.     The EPA's Notice of Violation notes that, despite having the opportunity to do so, Defendants have failed to show that it did not know, or should not have known, that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act.]"

78.     The same day, CARB publicly announced that it, too, has issued a Notice of Violation to Defendants after detecting the AECDs in Defendants' 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel® vehicles. CARB also said the company failed to disclose the devices, which it said can "significantly increase" NOx emissions when activated.

79.     Defendants were motivated by the desire to grab market share in the United States by adding diesel engines to their light truck and SUV lineup.  Dodge and Ram were already well known for their heavy-duty trucks equipped with large 8-cylinder engines supplied by Cummins. Unlike in Europe, where diesel engines in economy cars and small commercial vehicles have long been popular, diesel engines have always had trouble catching on in the United States. Many consumers see diesel engine vehicles as polluting vehicles that emit thick smoke and dangerous contaminants.  Even though Defendants were successful with their Dodge and Ram Cummins-equipped heavy-duty trucks, they still suffered from this perception. Indeed, a community of enthusiasts has grown around "rolling coal"—that is, modifying the vehicles' emissions systems to belch black clouds of smoke and particulates.

80.     However, other manufacturers—most notably, Volkswagen— began selling smaller, more economical vehicles in the U.S. with diesel engines labeled as environmentally-friendly, fuel-efficient alternatives to hybrids and other economical vehicles. Like Volkswagen, Fiat had considerable expertise with diesel engines in Europe, primarily through its subsidiary

-17-

VM Motori, a leading supplier of diesel engines. Prior to Fiat's takeover of Chrysler, when VM Motori was controlled by DaimlerChrysler and then General Motors, VM Motori supplied diesel engines for use in Chrysler/Jeep and General Motors automobiles.

81.     The engine at issue—now known as "EcoDiesel®," a 3.0-liter, six-cylinder turbodiesel— had been under development before Fiat acquired any of VM Motori for use in a General Motors automobile for the European market.

82.     After acquiring a 50% stake in VM Motori, Defendants began to integrate a 3.0-liter, six-cylinder V.M. Motori turbodiesel engine into FCA's popular light-duty trucks and SUVs, the Ram 1500 pickup and the Jeep Grand Cherokee.  These vehicles supposedly offered the benefits of diesel performance and fuel economy to a market quite distinct from those who bought heavy-duty, Cummins-equipped Ram 2500 and 3500 trucks.

83.     As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. …We combined resources and developed them together."

84.     On information and belief, because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a defeat device was necessary to certify the engine to U.S. emissions standards and include it in FCA vehicles.

85.     The modern type of smaller, turbocharged, direct-injected diesel engines, like Volkswagen's "Clean Diesel" TDI and Fiat Chrysler's EcoDiesel® engines, offer several benefits that maximize the potential of diesel fuel. Turbochargers force air into the combustion chambers, aiding in achieving higher compression, enhancing the efficiency with which power is extracted from the fuel. Direct fuel injection allows a sophisticated engine management

-18-

computer to precisely manage the air- fuel mixture at all times to maximize power and efficiency.

86.    The EcoDiesel® option, however, is not cheap.  For example, the feature is only available on the three most expensive 2014 Grand Cherokee models and adds $4,500 to those vehicles' overall price.  The EcoDiesel® option on the 2015 Ram 1500 adds between $3,120 and $4,960.

87.    Setting aside cost, diesel still comes with an environmental trade- off: high emissions of particulates and oxides of nitrogen. NOx is a hazardous pollutant and "an indirect greenhouse gas" that contributes to the formation of ground-level ozone, a greenhouse gas, and can travel hundreds of miles from the source of emission. Ozone is a colorless and odorless gas that, even at low levels, can cause cardiovascular and respiratory health problems, including chest pain, coughing, throat irritation, and congestion. The human health concerns from over-exposure to NOx are well established, and include negative effects on the respiratory system, damage to lung tissue, and premature death. NOx can penetrate deeply into sensitive parts of the lungs, and is known to cause or worsen respiratory diseases like asthma, emphysema, and bronchitis, as well as to aggravate existing heart disease. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are particularly susceptible to such adverse health effects, though the impact of NOx is borne by all of society.

88.    To address the hazards of NOx, modern technology has offered a solution. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many diesel vehicles also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are

-19-

emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

89.     The Fraudulent Vehicles use engine management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions performance for different driving situations.

90.     The computer that manages these systems in the Fraudulent Vehicles is an "electronic diesel control" or "EDC." The "defeat device" consists of software programming on this computer that detect when the Fraudulent Vehicles are undergoing emissions testing through certain sensor inputs that monitor vehicle speed, engine operation, steering wheel positioning, and the like. This type of defeat device has been termed a "cycle detection defeat device" because it detects when a vehicle is being tested and then operates the engine and emissions controls in such a way to trick the emissions testing so that the vehicles pass.  The measures required to pass emissions testing result in some combination of traits that would be undesirable in normal operation.  These include greater fuel consumption, lower performance, or unsustainable consumption of the urea solution used in SCR.   Defendants ensured that at all times, other an emissions testing, the Fraudulent Vehicles operated in a manner that polluted many times more than the legal limits.

B.      **Applicable Emissions Standards & Testing**

91.     When a manufacturer wishes to introduce a new car in the U.S. market, it must obtain a certificate of conformity ("COC") from the EPA, by showing that the vehicle comports with the requirements of the Clean Air Act, 42 USC § 7522 and 40 CFR 86.1843-01.

92.     As part of that certification process, the manufacturer must disclose any "auxiliary emission control devices" ("AECDs") that are included in the vehicle. AECDs are "any element of design which senses temperature, vehicle speed…or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 CFR 86.1803-01.  All vehicles have AECDs, and there is nothing per se illegal about modulating the operation of emissions control systems. However, in applying for a COC, the manufacturer must list all AECDs in the vehicles, and then justify why they are not defeat devices. 40 CFR 86.1844-01(d)(11). Thus, Defendants' willful omission violates the CAA.

93.     40 CFR 86.1803-01 provides that: "Defeat device means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

(1)     Such conditions are substantially included in the Federal emission test procedure;

(2)     The need for the AECD is justified in terms of protecting the vehicle against damage or accident; or

(3)     The AECD does not go beyond the requirements of engine starting."

94.     Here, the Fraudulent Vehicles are equipped with a Defeat Device and passed emissions testing only by cheating.  The Fraudulent Vehicles should never have received COCs that rendered them legal to sell in the U.S.

95.     On- road tests of the Fraudulent Vehicles showed that FCA EcoDiesel® produces NOx emissions well above legal limits.

96.     A 2014 Ram 1500 equipped with a 3.0L EcoDiesel® engine and featuring selective catalytic reduction (SCR) NOx after-treatment technology was tested on a chassis dynamometer as well as on the road. In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THS) were measured on a continuous basis using a real-time particle sensor from Pegasor.

97.     The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (i.e., in the laboratory). The vehicle produced approximately 15-19 times more NOx on the road than the certification standard allows. Moreover, the NOx emissions during highway driving conditions exceeded the EPA Tier 2 Bin 5 standard under which the vehicle was certified by 35 times.

**C.     Defendants Marketed the Fraudulent Vehicles as Environmentally Friendly, Emissions-Compliant, and Fuel-Efficient.**

98.     FCA's EcoDiesel® vehicles are aggressively marketed as offering a combination of power, efficiency, and environmental cleanliness that competitors cannot match: the Fraudulent Vehicles' "exhaust is ultra-clean" due to their "advanced emissions-control technology." According to Defendants, the "emissions control system helps ensure that virtually no particulates and minimal [NOx] exit the tailpipe."

99.     Defendants also represented that the Fraudulent Vehicles are emission-compliant in all 50 states (see image below, featuring the slogan "love the planet along with great fuel economy?"). Defendants bolstered that claim by including in the owner's manual an Emissions Warranty guaranteeing compliance with applicable emissions regulations.

100.    The Defendants represented and marketed the Fraudulent Vehicles as offering excellent fuel economy: greater than a comparable gasoline engine and offering a range of 730 miles on a single tank of diesel fuel.  According to Defendants, the Fraudulent Vehicles had "the best fuel economy of any full-size pickup" (examples below).



101.    Defendants even went so far as to offer on their website calculators that supposedly show how much fuel, time and money consumers could save. For example:



102.    But unbeknownst to those consumers—consumers who Defendants identified as wanting "an efficient, environmentally-friendly truck without sacrificing capability or performance— Defendants could only achieve those impressive results by cheating on emissions testing.  Moreover, in normal driving, the vehicles polluted much more than advertised or permissible by applicable laws.

# VI.  STATUTES OF LIMITATION ARE TOLLED

103.    The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

104.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs could not have discovered that Defendants were concealing and misrepresenting the true emissions levels of their vehicles, including but not limited to their use of defeat devices.

105.    Plaintiffs could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, or that Defendants had intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers, until shortly before this action was filed.

106.     Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs shortly before this action was filed.

## A.    Tolling Due To Fraudulent Concealment

107.    Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

108.    Upon information and belief, prior to the date of this Complaint, if not earlier, Defendants knew of the defeat device in the Fraudulent Vehicles, but continued to distribute, sell, and/or lease the Fraudulent Vehicles to Plaintiffs. In doing so, Defendants concealed and

expressly denied the existence of problem with NOx emissions, and/or failed to notify Plaintiffs about the true nature of the Fraudulent Vehicles.

109.    Instead of disclosing their deception, or that the emissions from the Fraudulent Vehicles were far worse than represented, Defendants falsely represented that its vehicles complied with federal and state emissions standards, and that they were reputable manufacturers whose representations could be trusted.

**B.    Estoppel**

110.    Defendants have a continuous and on-going duty to tell the truth about their products and to disclose to Plaintiffs the facts that they knew about the emissions from Vehicles, and of those vehicles' failure to comply with federal and state laws.

111.    Although they had the duty throughout the relevant period to disclose to Plaintiffs that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Fraudulent Vehicles, and intentionally misrepresented their blatant and deceptive lack of compliance with federal and state law regulating vehicle emissions and clean air.

112.    Defendants actively concealed the true character, quality, performance, and nature of the defeat device in the Fraudulent Vehicles, and Plaintiffs reasonably relied upon Defendants' knowing and active concealment of these facts.

113.    Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

# VII.   CAUSES OF ACTION

## COUNTS COMMON TO ALL PLAINTIFFS

### COMMON COUNT 1
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### Violation of 18 U.S.C. § 1962(c)-(d)
### (On Behalf of all Plaintiffs)

114.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

115.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

116.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

117.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

118.    In order to compete with vehicle manufacturers and increase their market share, Defendants sought to add diesel engines to their light truck and SUV lineup. But, due to the strict emissions control requirements imposed by U.S. law and the demands of consumers in the United States, they found it impossible to achieve their goals lawfully, and instead resorted to cheating through a fraudulent scheme and conspiracy. The illegal scheme was hatched overseas by Fiat Chrysler Automobiles N.V., brought to U.S. shores by and through the vehicles of FCA US LLC, and executed in conjunction with Fiat's subsidiary companies overseas, including VM Motori.

119.     Specifically, Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of a RICO enterprise (defined below and referred to collectively as the "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Fraudulent Vehicles were compliant with emission standards, clean, fuel efficient and environmentally friendly so as to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Fraudulent Vehicles and the defeat devices installed therein. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of billions of dollars from Plaintiffs. As explained in detail below, Defendants' years-long misconduct violated Sections 1962(c) and (d).

### a.     Description of the Defeat Device RICO Enterprise

120.     In an effort to expand its global reach, market share, and standardized marketing and sales in the U.S., Italian automaker Fiat (then controlled by an Italian holding company) acquired American automaker Chrysler. This acquisition occurred gradually over a period of years, between 2009 and 2014 and resulted in the creation of FCA US LLC. All Fiat assets, including both FCA US and FCA Italy and their respective subsidiaries, were later merged into Fiat Chrysler Automobiles N.V., a new Dutch holding company, in 2014.

121.     At all relevant times, Defendants maintained tight control over the design, manufacture, and testing of the Fraudulent Vehicles. Their business operations in the United States include, for example, the manufacture, distribution, and sale of motor vehicles and parts through their network of independent, franchised motor vehicle dealers.

122.     At all relevant times, Defendants, along with other individuals and entities, including unknown or additional third parties involved in the design, manufacture, testing, and

sale of the Fraudulent Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining certificates of compliance from the Environmental Protection Agency (and executive orders from CARB) in order to sell Vehicles containing defeat device(s) throughout the U.S., and through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

123.    Specifically, Fiat Chrysler Automobiles N.V. and/or FCA US LLC are the entities that applied for, and obtained, the EPA certificates of compliance for the Fiat-Chrysler branded Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of commerce.

124.    Defendants used their network of independent, franchised motor vehicle dealers to distribute and sell the illegal Vehicles throughout the U.S.

125.    VM Motori participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, testing, and/or supplying V6 diesel engines which contained and concealed unlawful defeat device(s) to Defendants.

126.    VM Motori began development of this engine before its acquisition by Fiat.  Fiat acquired half of VM Motori in 2011, and completed its acquisition only in late 2013, after the engine and the Fraudulent Vehicles had been developed, certified by the EPA, and put on sale in the United States.

127.    The separate legal statuses of Defendants and VM Motori facilitated the fraudulent scheme and attempted to provide a shield from liability for Defendants and their co-conspirators.

128.    Alternatively, Defendants, their subsidiaries, and their directors, officers, and engineers constitute a single "enterprise" within the meaning of 18 U.S.C. § 1961(4), through

-30-

which Defendants conducted their pattern of racketeering activity in the U.S. The enterprises, alleged in this and the previous paragraphs, are referred to collectively as the "Defeat Device RICO Enterprise."

129.   At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

130.   The association-in-fact Defeat Device RICO Enterprise consisted of the following entities and individuals:

### (i)   The Fiat-Chrysler Entity Defendants

131.   Fiat Chrysler Automobiles N.V. and its American subsidiary FCA US LLC, working with the other below-described members of the Defeat Device RICO Enterprise, devised a scheme to illegally circumvent the U.S.'s stringent emissions standards by incorporating a "defeat device" into the Fraudulent Vehicles' engine management computers.

132.   Employing this technology, Defendants fraudulently obtained certificates of compliance (and executive orders) for the Fraudulent Vehicles, even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions

133.   Moreover, to profit from the scheme and increase their sales, Defendants falsely marketed the Fraudulent Vehicles as not only compliant but clean, fuel-efficient and environmentally-friendly vehicles.

### (ii)   VM Motori

134.   VM Motori S.p.A. ("VM Motori") is a diesel engine manufacturer based in in Cento, Italy. In 2011, Fiat purchased a 50% share of the company from Penske Corporation.

General Motors controlled the other 50%. Fiat bought the remaining 50% from General Motors in late 2013, after the Fraudulent Vehicles and engines had already been developed, certified by the EPA, and offered for sale in the United States.

135.    Back in 2010 or 2011, VM Motori announced a new product line of a V6, 3.0L displacement engines for inclusion in SUVs, trucks, and large sedans. These engines had been under development for use in a General Motors automobile for the European market.

136.    However, further development for use in FCA vehicles took place following Fiat's acquisition of 50% of VM Motori in 2011. As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. …We combined resources and developed them together."

137.    According to their website, VM Motori is deeply involved in the development of testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."

138.    In fact, VM Motori makes specific mention of their involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.)," and notes that their facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."

139.    During all relevant periods, VM Motori developed and supplied engines for the Fraudulent Vehicles which contained, were calibrated to, or suppressed the existence of a defeat device, in furtherance of the Defeat Device RICO Enterprise.

**b.    The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

140.    Because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a defeat device was necessary to certify the engine to U.S. emissions standards and include it in the Fraudulent Vehicles.

141.    At all relevant times, the Defeat Device RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendants, their subsidiaries, officers, executives, and engineers, VM Motori, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Fraudulent Vehicles to Plaintiffs through fraudulent certificates of compliance and executive orders, false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the Defeat Device RICO Enterprise shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Plaintiffs.

142.    The Defeat Device RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Fraudulent Vehicles.

143.     The Defeat Device RICO Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease throughout the country, and the receipt of monies from the sale of the same.

144.     Within the Defeat Device RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Defeat Device RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Fraudulent Vehicles to the general public nationwide.

145.     Each participant in the Defeat Device RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Defeat Device RICO Enterprise, Defendants functioned as a unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

146.     Defendants participated in the operation and management of the Defeat Device RICO Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the enterprise, they had and have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

147.     Defendants exerted substantial control over the Defeat Device RICO Enterprise, and participated in the affairs of the Defeat Device RICO Enterprise by:

A.      designing the Fraudulent Vehicles with defeat devices;

B.      failing to correct or disable the defeat devices;

C.      manufacturing, distributing, and selling the Fraudulent Vehicles that emitted greater pollution than allowable under the applicable regulations;

D.      misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on certificate of compliance and executive order applications;

E.      introducing the Fraudulent Vehicles into the stream of U.S. commerce without a valid EPA certificate of compliance and/or CARB executive order;

F.      concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

G.      misleading the driving public as to the nature of the defeat devices and the defects in the Fraudulent Vehicles;

H.      designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

I.      otherwise misrepresenting or concealing the defective nature of the Fraudulent Vehicles from the public and regulators;

J.      illegally selling and/or distributing the Fraudulent Vehicles;

K.      collecting revenues and profits from the sale of such products; and

L.      ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

148.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

### c.   Mail and Wire Fraud

149.   To carry out, or attempt to carry out the scheme to defraud, Defendants, each of whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

150.   Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity which Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Defeat Device RICO Enterprise. Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

151.   Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

152.   In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, Defendants

committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

153.    Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Fraudulent Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

154.    Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

A.    the Fraudulent Vehicles themselves;

B.    component parts for the defeat devices;

C.    essential hardware for the Fraudulent Vehicles;

D.    falsified emission tests;

E.    fraudulent applications for EPA certificates of compliance and CARB executive orders;

F.    fraudulently-obtained EPA certificates of compliance and CARB executive orders;

G.    vehicle registrations and plates as a result of the fraudulently-obtained EPA certificates of compliance and CARB executive orders;

H.    documents and communications that facilitated the falsified emission tests;

-37-

I.     false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

J.     sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Fraudulent Vehicles;

K.     documents intended to facilitate the manufacture and sale of the Fraudulent Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.     documents to process and receive payment for the Fraudulent Vehicles by unsuspecting consumers including invoices and receipts;

M.     payments to VM Motori;

N.     millions of dollars in compensation to Fiat and FCA executives;

O.     deposits of proceeds; and

P.     other documents and things, including electronic communications.

155.    Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, Defendants, made misrepresentations about the Fraudulent Vehicles on their websites, YouTube, and through advertisements online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

156.    For example, as pictured below and in numerous examples above, Defendants announced that the EcoDiesel® engine, installed in the Jeep Grand Cherokee is "efficient" and environmentally friendly: "leaving little trace of being there."



157.    Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme

158.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and to lure consumers into purchasing the Fraudulent Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign.

159.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

160.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants

conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co- conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

161.    Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

162.    To achieve their common goals, Defendants hid from the general public the unlawfulness and emission dangers of the Fraudulent Vehicles and obfuscated the true nature of the defect

163.    Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Fraudulent Vehicles (and the defeat devices contained therein).

164.    Indeed, for the conspiracy to succeed each of Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Fraudulent Vehicles.

165.    Defendants knew and intended that government regulators, as well as Plaintiffs, would rely on the material misrepresentations and omissions made by them about the Fraudulent Vehicles. Defendants knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiffs, along with hundreds of thousands of other consumers, relied upon

Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that they purchased illegal vehicles that never should have been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by Defendants.

166.    As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs based on their misrepresentations and omissions, while providing Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

167.    The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiffs. The predicate acts were committed or caused to be committed by Defendants through their participation in the Defeat Device RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' funds and avoiding the expenses associated with remediating the Fraudulent Vehicles.

168.    During the design, manufacture, testing, marketing and sale of the Fraudulent Vehicles, Defendants shared technical, marketing, and financial information that revealed the existence of the defeat devices contained therein. Nevertheless, Defendants shared and disseminated information that deliberately misrepresented the Fraudulent Vehicles as legal, clean, environmentally friendly, and fuel efficient.

169.    By reason of, and as a result of the conduct of Defendants, and in particular, their pattern of racketeering activity, Plaintiffs have been injured in their business and/or property in multiple ways, including but not limited to:

A.      Purchase or lease of an illegal, Fraudulent Vehicle;

B.      Overpayment for a Vehicle;

C.      The value of the Fraudulent Vehicles has diminished, thus reducing their resale value;

D.      Other out-of-pocket and loss-of-use expenses;

E.      Payment for alternative transportation; and

F.      Loss of employment due to lack of transportation.

170.    Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Plaintiffs are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COMMONT COUNT 2**
**FRAUD BY CONCEALMENT**
**(Common Law)**
**(On Behalf of all Plaintiffs)**

171.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

172.    Defendants designed, manufactured, marketed, sold, and/or leased the Fraudulent Vehicles to Plaintiffs. Defendants represented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Fraudulent Vehicles had no significant defects, complied with EPA and state emissions regulations, and would perform and operate properly when driven in normal usage.

-42-

173.   Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead both regulators and Plaintiffs about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.

174.   The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings. Plaintiffs reasonably relied upon Defendants' false representations. They had no way of knowing that Defendants' representations were false and gravely misleading. As alleged herein, Defendants employed sophisticated methods of deception. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

175.   Defendants concealed and suppressed material facts concerning their true corporate cultures—cultures characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. They also emphasized profits and sales above the trust that Plaintiffs placed in their representations. Consumers buy diesel cars from FCA because they feel they are clean

-43-

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Fraudulent Vehicles are doing during real-world driving conditions.

176.    Necessarily, Defendants also took steps to ensure that its employees did not reveal the details of their deception to regulators or consumers, including Plaintiffs. Defendants did so in order to boost the reputations of their vehicles and to falsely assure purchasers and lessors of their vehicles, including certified previously owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air and emissions regulations, and that their vehicles likewise comply with applicable laws and regulations

177.    Defendants' false representations were material to consumers, both because they concerned the quality of the Defeat Device Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Defendants well knew, their customers, including Plaintiffs, highly valued that the vehicles they were purchasing or leasing were so-called EcoDiesel® vehicles with reduced emissions—a label only made possible by concealing the vehicles' true emissions levels from regulators.

178.    Defendants had a duty to disclose the emissions deception they engaged in with respect to the vehicles at issue because knowledge of the deception and its details were known and/or accessible only to Defendants, Defendants had exclusive knowledge as to implementation and maintenance of their deception, and Defendants knew the facts were unknown to or not reasonably discoverable by Plaintiffs.

179.    Defendants also had a duty to disclose because they made general affirmative representations about the qualities of their vehicles with respect to emissions standards which

were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding their emissions deception, the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue.

180. Having volunteered to provide information to Plaintiffs, Defendants had the duty to disclose the entire truth. These omitted and concealed facts were material because they directly affect the value of the Fraudulent Vehicles purchased or leased by Plaintiffs. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendants represented to Plaintiffs that they were purchasing or leasing reduced emission vehicles, and certification testing appeared to confirm this—except that, secretly, Defendants had thoroughly subverted the testing process.

181. Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that their vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and Defendants did so at the expense of Plaintiffs.

182. On information and belief, Defendants have still not made full and adequate disclosures and continue to defraud Plaintiffs by concealing material information regarding both the emissions qualities of their vehicles and their emissions deception.

183. Plaintiffs were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in

that they would not have purchased purportedly compliant cars manufactured by Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs.

184.    Because of the concealment and/or suppression of the facts, Plaintiffs have sustained damages because they own vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions and Defendants' failure to timely disclose the defect or defective design of the EcoDiesel® engine system, the actual emissions qualities and quantities of hundreds of thousands of Ram- and Jeep-branded vehicles, and the serious issues engendered by Defendants' corporate policies. Had Plaintiffs been aware of Defendants' emissions deceptions with regard to the vehicles at issue, and their callous disregard for compliance with applicable federal and state law and regulations, Plaintiffs who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

185.    The value of Plaintiffs' vehicles has diminished as a result of Defendants' fraudulent concealment of their emissions deception, which has greatly tarnished the brand names attached to Plaintiffs' vehicles and made any reasonable consumer reluctant to purchase any of the  Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

186.    Accordingly, Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

187.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COMMON COUNT 3
### BREACH OF CONTRACT
### (Common Law)
### (On Behalf of All Plaintiffs)

188.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

189.    Defendants' misrepresentations and omissions alleged herein, including Defendants' failure to disclose the existence of the "defeat device" and/or defective design as alleged herein, caused Plaintiffs to make their purchases or leases of their Vehicles. Absent those misrepresentations and omissions, Plaintiffs would not have purchased or leased these Vehicles, would not have purchased or leased these Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the "defeat device." Accordingly, Plaintiffs overpaid for their Vehicles and did not receive the benefits of their bargains.

190.    Each and every sale or lease of a Fraudulent Vehicle constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing Plaintiffs' Vehicles and by misrepresenting or failing to disclose the existence of the defeat device and/or defective design, including information known to Defendants rendering each Defeat Device Vehicle non-compliant with applicable emissions standards, and thus less valuable, than vehicles not equipped with defeat devices.

191.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COMMON COUNT 4**
**IMPLIED AND WRITTEN WARRANTY**
**Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq*.)**
**(On Behalf of all Plaintiffs)**

192.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

193.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 15 U.S.C. § 2310(d).

194.     Defendants' Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

195.     Plaintiffs are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

196.     Each Defendant is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

197.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty.

198.     As described herein, Defendants provided Plaintiffs with "implied warranties" and "written warranties" as those terms are defined in 15 U.S.C. § 2301.

199.     Defendants have breached these warranties as described in more detail above. Without limitation, Defendants' Vehicles are defective, as described above, which resulted in the problems and failures also described above.

-48-

200.     By Defendants' conduct as described herein, including knowledge of the defects inherent in the vehicles and Defendants' action, and inaction, in the face of the knowledge, Defendants have failed to comply with their obligations under their written and implied promises, warranties, and representations.

201.     In their capacity as warrantors, and by the conduct described herein, any attempts by Defendants to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective the software and supporting systems is null and void.

202.     All jurisdictional prerequisites have been satisfied.

203.     Plaintiffs are in privity with Defendants in that they purchased the software from Defendants or their agents.

204.     As a result of Defendants' breach of warranties, Plaintiffs are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

## COMMON COUNT 5
## UNJUST ENRICHMENT
### (On Behalf of all Plaintiffs)

205.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

206.     Plaintiffs conferred a benefit on Defendants by, *inter alia*, using (and paying a premium for) its vehicles.

207.     Defendants have retained this benefit, and know of and appreciate this benefit.

208.     Defendants were and continue to be unjustly enriched at the expense of Plaintiffs.

209.     Defendants should be required to disgorge this unjust enrichment.

**COMMON COUNT 6**
**VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT**
**(6 Del. Code § 2513, *et seq.*)**
**(On Behalf of all Plaintiffs)**

210.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

211.    Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

212.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

213.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real- world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

214.     Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception on their own.

215.     Defendants thus violated the Act by, at minimum: by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of  Vehicles.

216.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Delaware CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

217.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Delaware CFA.

218.     Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was

-51-

manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

219.    Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

220.    Defendants knew or should have known that their conduct violated the Delaware CFA.

221.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

222.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

223.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

224.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

225.     Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

226.     Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Delaware CFA. All owners of the Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

227.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

228.     As a direct and proximate result of Defendants' violations of the Delaware CFA, Plaintiffs have suffered injury-in-fact and/or actual damage.

229.     Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. See, e.g., *Stephenson v.*

*Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

230.    Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

**COMMON COUNT 7**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(6 Del. Code §§ 2-314 and 2A-212)**
**(On Behalf of all Plaintiffs)**

231.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

232.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

233.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

234.    The Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

235.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A- 212).

236.    These Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with

-54-

federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

237.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Vehicle defects became public.

238.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**COMMON COUNT 8**
**BREACH OF EXPRESS WARRANTY**
**(6 Del. Code §§ 2-313 and 2A-210)**
**(On Behalf of all Plaintiffs)**

239.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

240.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

241.    With respect to leases Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

242.    The Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

243.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

244.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

245.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

246.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

247.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

-56-

248. Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs purchased or leased their Vehicles equipped with the non- compliant "clean" diesel engine and emission systems.

249. Plaintiffs experienced defects within the warranty period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

250. Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

251. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

252. Accordingly, recovery by Plaintiffs are not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

253. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

254.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs whole.

255.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs purchase or lease price of all Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

256.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

257.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiff have been damaged in an amount to be determined at trial.

258.   Defendants did not promptly replace or buy back the Fraudulent Vehicles of Plaintiffs.

259.   As a result of Defendants' breach of its express warranties, Plaintiffs received goods whose dangerous condition substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of the diminished value of Defendants' products, the products' malfunctioning, and the nonuse of their Vehicles.

# VIII. STATE-SPECIFIC COUNTS

## ALABAMA COUNTS

### ALABAMA COUNT 1
### VIOLATIONS OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
(Ala. Code § 8-19-1, et seq.)
(On behalf of the Alabama Plaintiffs)

260.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

261.    Plaintiffs are "consumers" within the meaning of Ala. 11 Code § 8-19-3(2).

262.    Plaintiffs and Defendants are "persons" within the meaning of 13    Ala. Code § 8-19-3(5).

263.    The Fraudulent Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

264.    Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

265.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

266.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls

-59-

during real- world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

267. Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception on their own.

268. Defendants thus violated the Act by, at minimum: knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

269. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Alabama DTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

270. The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited

by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Alabama DTPA.

271.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

272.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

273.    Defendants knew or should have known that their conduct violated the Alabama DTPA.

274.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that

contradicted these representations.

275.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

276.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

277.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

278.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

279.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Alabama DTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants'

deceptive and unfair acts and practices made in the course of Defendants' business.

280.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

281.    As a direct and proximate result of Defendants' violations of the Alabama DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

282.    Pursuant to Ala. Code § 8-19-10, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala. Code § 8-19-1, et seq.

**ALABAMA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ala. Code §§ 7-2-314 and 7-2A-212)**
**(On behalf of the Alabama Plaintiffs)**

283.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

284.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

285.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

286.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h)

287.     A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

288.     These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

289.     Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

290.     As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### ALABAMA COUNT 3
### BREACH OF EXPRESS WARRANTY
#### (Ala. Code §§ 7-2-313 and 7-2A-210)
#### (On behalf of the Alabama Plaintiffs)

291.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

292.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

293.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

294.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

295.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

296.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

297.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

298.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

299.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

300.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs   and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

301.        Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

302.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

303.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

304.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as

1  allowed by law.

2      305.   Also, as alleged in more detail herein, at the time Defendants warranted and sold

3  or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently

4  defective and did not conform to their warranties; further, Defendants had wrongfully and

5  fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were

6  therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent

7  pretenses.

8      306.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be

9  resolved through the limited remedy of "replacements or adjustments," as many incidental and

10 consequential damages have already been suffered because of Defendants' fraudulent conduct

11 as alleged herein, and because of their failure and/or continued failure to provide such limited

12 remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be

13 insufficient to make Plaintiffs.

14     307.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs

15 assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and

16 the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned

17 or leased, and for such other incidental and consequential damages as allowed.

18     308.    Defendants were provided notice of these issues by numerous complaints filed

19 against them, including the instant Complaint, within a reasonable amount of time after Fiat

20 Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent

21 Vehicles to evade clean air standards.

22     309.   As a direct and proximate result of Defendants' breach of express warranties,

23 Plaintiffs have been damaged in an amount to be determined at trial.

-67-

**CALIFORNIA COUNTS**

**CALIFORNIA COUNT 1**
**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750, et seq.)**
**(On behalf of the California Plaintiffs)**

310.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

311.    Defendants are "person[s]" under Cal. Civ. Code § 1761(c).

312.    Plaintiffs are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Fraudulent Vehicles.

313.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, et seq., as described above and below by, at a minimum, representing that Fraudulent Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it has not.

314.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls

-68-

during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower   emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

315.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

316.    Defendants thus violated the Act by, at minimum:  knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

317.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the CLRA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

318.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited

by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the CLRA.

319. Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

320. Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

321. Defendants knew or should have known that their conduct violated the CLRA.

322. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.      made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

323. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

324. Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

325. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

326. Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

327. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the CLRA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

328.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

329.    As a direct and proximate result of Defendants' violations of the CLRA,  Plaintiffs have suffered injury-in-fact and/or actual damage.

330.    Under Cal. Civ. Code § 1780(a), Plaintiffs seek monetary relief against Defendants measured as the diminution of the value of their vehicles caused by Defendants' violations of the CLRA as alleged herein.

331.    Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against Defendants of up to $5,000 for each Plaintiff who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Defendants knew or should have known that their conduct was directed to one or more Plaintiffs who are senior citizens or disabled persons.  Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Plaintiffs who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

332.    Plaintiffs also seek punitive damages against Defendants because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to potential cruel and unjust hardship as a result.

333.     Defendants intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only Defendants knew. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

334.     Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

**CALIFORNIA COUNT 2**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200, et seq.)**
**(On behalf of the California Plaintiffs)**

335.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

336.     California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."   Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

337.     Defendants' conduct, as described herein, was and is in violation of the UCL.

338.     Defendants' conduct violates the UCL in at least the following ways:

a.      by knowingly and intentionally concealing from Plaintiffs that the Fraudulent Vehicles suffer from a design defect while obtaining money from Plaintiffs;

b.      by marketing Fraudulent Vehicles as possessing functional and defect-free, EPA-compliant "clean" diesel engine systems;

c.      by purposefully installing an illegal "defeat device" in the Fraudulent Vehicles to fraudulently obtain EPA certification and cause Fraudulent Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

    a.   by violating federal laws, including the Clean Air Act; and

    b.   by violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

339.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs to make their purchases or leases of their Fraudulent Vehicles.

340.    Absent those misrepresentations and omissions, Plaintiffs would not have purchased or leased these vehicles, would not have purchased or leased these Fraudulent Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain "clean" diesel engine systems that failed to comply with EPA and California emissions standards.

341.    Accordingly, Plaintiffs have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

342.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants under Cal. Bus. & Prof. Code § 17200.

343.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

### CALIFORNIA COUNT 3
### VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW
#### (Cal. Bus. & Prof. Code §§ 17500, et seq.)
#### (On behalf of the California Plaintiffs)

344.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

-74-

345.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

346.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs

347.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Fraudulent Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

348.    Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Fraudulent Vehicles, Plaintiffs relied on the misrepresentations and/or omissions of Defendants with respect to the safety, performance and reliability of the Fraudulent Vehicles. Defendants' representations turned out not to be true because the Fraudulent Vehicles are distributed with faulty and defective "clean" diesel engine systems, rendering certain safety and emissions functions inoperative. Had Plaintiffs known this, they would not have purchased or leased their Fraudulent Vehicles and/or paid as much for them.  Accordingly, Plaintiffs overpaid for their Fraudulent Vehicles and did not receive the benefit of their bargain.

349.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

350.    Plaintiffs, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**CALIFORNIA COUNT 4**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Cal. Com. Code §§ 2314 and 10212)**
**(On behalf of the California Plaintiffs**

351.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

352.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

353.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

354.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

355.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

356.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

357.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

358.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## CALIFORNIA COUNT 5
## BREACH OF EXPRESS WARRANTY
### (Cal. Com. Code §§ 2313 and 10210)
### (On behalf of the California Plaintiffs)

359.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

360.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

361.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

362.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

363.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

364.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

365.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

366.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

367. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

368. Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

369. Plaintiffs experienced defects within the warranty period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

370. Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

371. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

372. Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

373. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and

fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

374.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

375.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

376.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

377.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## CALIFORNIA COUNT 6
## VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR
## BREACH OF EXPRESS WARRANTIES
## (Cal. Civ. Code §§ 1791.2 & 1793.2(d))
## (On behalf of the California Plaintiffs)

378.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

379.    Plaintiffs who purchased or leased the Fraudulent Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

380.    The Fraudulent Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

381.    Defendants are "manufacturer[s]" of the Fraudulent Vehicles within the meaning of Cal. Civ. Code § 1791(j).

382.    Plaintiffs bought/leased new motor vehicles manufactured by Defendants. Defendants made express warranties to Plaintiffs within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

383.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

384.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

385.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty

required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

386.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

387.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

388.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs   and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

389.    Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

390.     Plaintiffs gave Defendants or their authorized repair facilities opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because Defendants or their authorized repair facility refused to attempt the repair. Defendants did not promptly replace or buy back the Fraudulent Vehicles of Plaintiffs.

391.     As a result of Defendants' breach of its express warranties, Plaintiffs received goods whose dangerous condition substantially impairs their value to Plaintiffs. Plaintiffs have been damaged as a result of the diminished value of the Defendants' products, the products' malfunctioning, and the nonuse of their Fraudulent Vehicles.

392.     Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, at their election,  the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles.

393.     Pursuant to Cal. Civ. Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

### CALIFORNIA COUNT 7
### VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Cal. Civ. Code §§ 1791.1 and 1792)
### (On behalf of the California Plaintiffs)

394.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

395.     Plaintiffs and who purchased or leased the Fraudulent Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

396.     The Fraudulent Vehicles are "consumer goods" within the meaning of Cal. Civ. Code 12     § 1791(a).

397.    Defendants are "manufacturer[s]" of the Fraudulent Vehicles within the meaning of Cal. Civ. Code § 1791(j).

398.    Defendants impliedly warranted to Plaintiffs that its Fraudulent Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Fraudulent Vehicles do not have the quality that a buyer would reasonably expect.

399.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

400.    The Fraudulent Vehicles would not pass without objection in the automotive trade because of the defects in the Fraudulent Vehicles' "clean" diesel engine system. Specifically, the Fraudulent Vehicles do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative.  In addition, the "clean" diesel engine system was not adequately designed, manufactures, and tested.

401.    Because of the defects in the Fraudulent Vehicles' "clean" diesel engine system, they are not in merchantable condition and thus not fit for ordinary purposes.

402.    The Fraudulent Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Fraudulent Vehicles' "clean" diesel engine system.

403.    Defendants breached the implied warranty of merchantability by manufacturing and selling Fraudulent Vehicles containing defects associated with the "clean" diesel engine

system. Furthermore, these defects have caused Plaintiffs to not receive the benefit of their bargain and have caused Fraudulent Vehicles to depreciate in value.

404.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs received goods whose defective condition substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of the diminished value of Defendants' products, the products' malfunctioning, and the nonuse of their Fraudulent Vehicles.

405.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles.

406.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT 8**
**BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES**
**(Cal. Civ. Code §§ 1793.2, et seq.)**
**(On behalf of the California Plaintiffs)**

407.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

408.    Each Fraudulent Vehicle is covered by express California Emissions Warranties as a matter of law. See Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

409.    The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." Id. This provision applies without any time or mileage limitation. See id.

410.    The California Emissions Warranties also specifically warrant Plaintiffs against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. See id.

411.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

412.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. See Cal. Civ. Code § 1793.2(d)(2).

413.    Plaintiffs are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Defendants is refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

414.    This complaint is written notice of nonconformity to Defendants and "shall" constitute return of the goods." *Id.*

415.    Plaintiffs are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility because Defendants admit they has no ability to do so at this time. See In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 970-71 (N.D. Cal. 2014)

-86-

416.    In addition to all other damages and remedies, Plaintiffs are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. See Cal. Civ. Code § 1794(e)(1). Defendants' existing "qualified third-party dispute resolution process" does not relieve Defendants from the civil penalty imposed because Defendants are not offering the process to Plaintiffs for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant. See Cal. Civ. Code § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

### CALIFORNIA COUNT 9
### FAILURE TO RECALL/RETROFIT
#### (On behalf of the California Plaintiffs)

417.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

418.    Defendants manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Fraudulent Vehicles, as set forth above.

419.    Defendants knew or reasonably should have known that the Fraudulent Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable.

420.    Defendants became aware that the Fraudulent Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable after the Fraudulent Vehicles were sold.

421.    Defendants failed to recall the Fraudulent Vehicles in a timely manner or warn of the dangers posed by Fraudulent Vehicles. In addition, Defendants' recall in connection with the Fraudulent Vehicles was ineffective because it did not mitigate or  otherwise resolve the illegal and excessive NOx emissions.

422.     A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Fraudulent Vehicles.

423.     Plaintiffs were harmed by Defendants' failure to recall the Fraudulent Vehicles properly and in a timely manner and, as a result, have suffered damages, including their out-of-pocket costs, losses, and inconvenience expended in complying with the false recall, and caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the Fraudulent Vehicles.

424.     Defendants' failure to timely recall the Fraudulent Vehicles was a substantial factor in causing the harm to Plaintiffs as alleged herein.

## COLORADO COUNTS

### COLORADO COUNT 1
### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (Col. Rev. Stat. § 6-1-101, et seq.)
### (On behalf of the Colorado Plaintiffs)

425.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

426.     Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, et seq.

427.     Plaintiffs are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Fraudulent Vehicles.

428.     The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Fraudulent Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Fraudulent Vehicles are of a particular standard, quality, and grade even

though Defendants knew or should have known they are not; (3) advertising the Fraudulent Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Fraudulent Vehicles that was known to Defendants at the time of advertisement or sale with the intent to induce Plaintiffs to purchase, lease or retain the Fraudulent Vehicles

429.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real- world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

430.    Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception on their own.

431.    Defendants thus violated the Act by, at minimum: knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

432.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Colorado CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

433.     The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Colorado CPA.

434.     Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

435.     Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

436.     Defendants knew or should have known that their conduct violated the Colorado CPA.

437.     Defendants owed Plaintiffs a duty to disclose the illegality and public health and

safety risks of the Fraudulent Vehicles because they:

A.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.     intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.     made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

438.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

439.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

440.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

441.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate

result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

442.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Colorado CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

443.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

444.    As a direct and proximate result of Defendants' violations of the Colorado CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

445.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff.

446.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COLORADO COUNT 2**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Col. Rev. Stat. §§ 4-2-313 and 4-2.5-212)**
**(On behalf of the Colorado Plaintiffs)**

447.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

448.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d)

449.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

450.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

451.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. § § 4- 3  2-313 and 4-2.5-212).

452.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

453.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others

within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

454.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### COLORADO COUNT 3
### BREACH OF EXPRESS WARRANTY
#### (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)
#### (On behalf the Colorado Plaintiffs)

455.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

456.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

457.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

458.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

459.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

460.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

461.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its

vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

462.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

463.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

464.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

465.    Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally

designed and manufactured to be out of compliance   with applicable state and federal emissions laws, and failed to fix the defective emission components   free of charge.

466.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

467.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

468.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

469.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

470.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

471.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

472.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

473.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## <u>FLORIDA COUNTS</u>

### FLORIDA COUNT 1
### VIOLATIONS OF FLORIDA'S UNFAIR &
### DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, et seq.)

474.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

475.    Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

476.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

477.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …"

Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

478.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

479.    Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception on their own.

480.    Defendants thus violated the Act by, at minimum: knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

481.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the FUDTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

482.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the FUDTPA.

483.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

484.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

485.    Defendants knew or should have known that their conduct violated the FUDTPA.

486.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.      made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

487.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

488.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

489.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

490.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid

significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

491.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in  the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

492.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

493.    As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

494.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

495.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**FLORIDA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(F.S.A. §§ 672.314 and 680.212)**
**(On behalf of the Florida Plaintiffs)**

496.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

497.    Defendants are and were at all relevant times "merchants" under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

498.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

499.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

500.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to .S.A. §§ 672.314 and 680.212.

501.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

502.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

503.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**FLORIDA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(F.S.A. §§ 672.313 and 680.21)**
**(On behalf of the Florida Plaintiffs)**

504.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

505.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

506.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

507.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

508.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

509.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

510.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

511.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

512.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

513.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

514.    Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

515.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

516.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

517.     Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

518.     Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

519.     Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

520.     Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

521.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat

Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent

Vehicles to evade clean air standards.

522.     As a direct and proximate result of Defendants' breach of express warranties,

Plaintiffs have been damaged in an amount to be determined at trial.

**GEORGIA COUNTS**

**GEORGIA COUNT 1**
**VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**(Ga. Code Ann. § 10-1-390, et seq.)**
**(On behalf of the Georgia Plaintiffs)**

523.     Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

524.     The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or

deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices

in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to

"representing that goods or services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a

particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services

with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

525.     In the course of their business, Defendants concealed and suppressed material facts

concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that

enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and

global  warming—to pass EPA emissions testing while at the same time disabling the same controls

during real-  world driving. Specifically, the software was designed to cheat emission testing by

showing lower  emissions during laboratory testing conditions then actually existed when the

vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass

emission certification tests through  deliberately induced lower-than-real-world emissions readings.

526.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

527.    Defendants thus violated the Act by, at minimum:  knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

528.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Georgia FBPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

529.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law   and therefore engaged in conduct that

violates the Georgia FBPA.

530.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

531.    Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

532.    Defendants knew or should have known that their conduct violated the Georgia FBPA.

533.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

534.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

535.    Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

536.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

537.    Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

538.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Georgia FBPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

539.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public

interest.

540.    As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

541.    Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

542.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

## GEORGIA COUNT 2
## VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (Ga. Code Ann. § 10-1-370, et seq.)
### (On behalf of the Georgia Plaintiffs)

543.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

544.    Defendants and Plaintiffs are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1-371(5).

545.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

546.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by

showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through  deliberately induced lower-than-real-world emissions readings.

547.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

548.    Defendants thus violated the Act by, at minimum:  knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

549.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Georgia UDTPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

550.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Georgia UDTPA.

551.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

552.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

553.    Defendants knew or should have known that their conduct violated the Georgia UDTPA.

554.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

555.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

556.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

557.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

558.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

559.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Georgia UDTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

560.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

561.    As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

562.    Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

**GEORGIA COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)**
**(On behalf of the Georgia Plaintiffs)**

563.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

564.    Defendants are and were at all relevant times "merchants" under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

565.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

566.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

567.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11- 5 2-314 and 11-2A-212.

568.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are

used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

569.     Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

570.     As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**GEORGIA COUNT 4**
**BREACH OF EXPRESS WARRANTY**
**(Ga. Code. Ann. §§ 11-2-313 and 11-2A-210)**
**(On behalf of the Georgia Plaintiffs)**

571.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

572.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

573.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

574.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. § 11-2A-103(1)(p).

575.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

576.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

577.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

578.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

579.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

580.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs   and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

581.        Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

582.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

583.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

584.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

585.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and

fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

586.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

587.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

588.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

589.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

**IDAHO COUNTS**

**IDAHO COUNT 1**
**VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT**
**(Idaho Code § 48-601, et seq.)**
**(On behalf of Idaho Plaintiffs)**

590.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

591.    Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

592.    Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

593.    Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.

594.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through    deliberately induced lower-than-real-world emissions readings.

595.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

596.    Defendants thus violated the Act by, at minimum:  knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

597.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Idaho CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

598.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Idaho CPA.

599.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not

comply with EPA regulations. Defendants concealed this information as well.

600.   Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

601.   Defendants knew or should have known that their conduct violated the Idaho CPA.

602.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.   intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

603.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

604.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

605.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

606.     Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to   disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

607.     Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Idaho CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

608.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

609.     As a direct and proximate result of Defendants' violations of the Idaho CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

610.     Pursuant to Idaho Code § 48-608, Plaintiffs seek monetary 9relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff.

611.     Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

612.      Plaintiffs also seek punitive damages against Defendants because Defendants' conduct evidences an extreme deviation from reasonable standards.

613.     Defendants flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of  the Fraudulent Vehicles, deceived Plaintiffs on life-or-death matters, concealed material facts that only they knew, and repeatedly promised Plaintiffs all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Fraudulent Vehicles.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**IDAHO COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Idaho Code §§ 28-2-314 and 28-12-212)**
**(On behalf of the Idaho Plaintiffs)**

614.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

615.     Defendants are and were at all relevant "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of  motor vehicles under § 28-2-103(1)(d).

616.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

-123-

617.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

618.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2- 5 and 28-12-212.

619.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

620.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

621.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**IDAHO COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Idaho Code §§ 28-2-313 and 28-12-210)**
**(On behalf of the Idaho Plaintiffs)**

622.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

623.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

624.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

625.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

626.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

627.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

628.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

629.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

630.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

631.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

632.    Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

633.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

634.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

635.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

636.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

637.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

638.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

639.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat

Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent

Vehicles to evade clean air standards.

640. As a direct and proximate result of Defendants' breach of express warranties,

Plaintiffs have been damaged in an amount to be determined at trial.

### ILLINOIS COUNTS

### ILLINOIS COUNT 1
### VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1, et seq. and 720 ILCS 295/1a)
### (On behalf of the Illinois Plaintiffs

641. Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

642. Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

643. Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

644. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois

CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or

employment of any deception, fraud, false pretense, false promise, misrepresentation or the

concealment, suppression or omission of any material fact, with intent that others rely upon the

concealment, suppression or omission of such material fact … in the conduct of trade or commerce

… whether any person has in fact been misled, deceived or damaged thereby." ILCS 505/2

645. In the course of their business, Defendants concealed and suppressed material facts

concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that

enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and

global  warming—to pass EPA emissions testing while at the same time disabling the same controls

during real-  world driving. Specifically, the software was designed to cheat emission testing by

showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through  deliberately induced lower-than-real-world emissions readings.

646.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

647.    Defendants thus violated the Act by, at minimum:  knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

648.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Illinois CFA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

649.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Illinois CFA.

650.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

651.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

652.    Defendants knew or should have known that their conduct violated the Illinois CFA.

653.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

-130-

654.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

655.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

656.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

657.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

658.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Illinois CFA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

659.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

660.     As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs have suffered injury-in-fact and/or actual damage.

661.     Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

662.     Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 et seq.

## ILLINOIS COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)
#### (On Behalf of the Illinois Plaintiffs)

663.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

664.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

665.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under  810 Ill. Comp. Stat. § 5/2A-103(1)(p).

666.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

667.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

668.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

669.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

670.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**ILLINOIS COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)**
**(On behalf of the Illinois Plaintiffs)**

671.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

672.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

673.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

674.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

675.     In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

676.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

677.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

678.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission

related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

679.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

680.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

681.    Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

682.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

683.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

684.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as

allowed by law.

685. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

686. Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

687. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

688. Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

689. As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## INDIANA COUNTS

### INDIANA COUNT 1
### VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (Ind. Code § 24-5-0.5-3)
### (On behalf of the Indiana Plaintiffs)

690.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

691.    Defendants are "person[s]" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier[s]" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

692.    Plaintiffs' purchases of the Fraudulent Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

693.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive act," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Ind. Code § 24-5-0.5-3.

694.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

695.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

696.    Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

697.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Indiana DCSA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and

efficiency, and that stood behind  its vehicles after they were sold.

698.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Indiana DCSA.

699.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

700.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

701.    Defendants knew or should have known that their conduct violated the Indiana DCSA.

702.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs;

and/or

C.     made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

703.     Defendants concealed the illegal defeat device and the true emissions, efficiency, and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

704.     Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

705.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

706.     Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as

lost or diminished use.

707.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Indiana DCSA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

708.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

709.    As a direct and proximate result of Defendants' violations of the Indiana DCSA, Plaintiffs have suffered injury-in-fact and/or actual damage.

710.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff, including treble damages up to $1,000 for Defendants' willfully deceptive acts.

711.    Plaintiff also seeks punitive damages based on the outrageousness and recklessness of the Defendants' conduct and high net worth.

**INDIANA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)**
**(On behalf of the Indiana Plaintiffs)**

712.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

713.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

714.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

715.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

716.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2- 10 and 26-1-2.1-212.

717.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

718.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

719.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### INDIANA COUNT 3
### BREACH OF EXPRESS WARRANTY
### (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)
### (On behalf of the Indiana Plaintiffs)

720.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

721.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

722.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

723.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

724.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

725.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

726.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

727.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

728.    As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

729.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

730.        Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

731.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

732.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

733.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

734.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

735.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

736.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

737.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat

Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

738.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## KANSAS COUNTS

### KANSAS COUNT 1
### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### (Kan. Stat. Ann. § 50-623, et seq.)
### (On behalf of the Kansas Plaintiffs)

739.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

740.    Defendants are "supplier[s]" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

741.    Plaintiffs are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Fraudulent Vehicles.

742.    The sale of the Fraudulent Vehicles to Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

743.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a

-146-

material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

744.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through    deliberately induced lower-than-real-world emissions readings.

745.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

746.    Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

747.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Kansas CPA by installing, failing to disclose and actively concealing the illegal

-147-

defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

748.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Kansas CPA.

749.     Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

750.     Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

751.     Defendants knew or should have known that their conduct violated the Kansas CPA.

752.     Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.     possessed exclusive knowledge that they were manufacturing, selling,

-148-

and  distributing vehicles throughout the United States that did not comply with EPA

regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs;

and/or

C.      made incomplete representations about the environmental cleanliness

and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device

in particular, while  purposefully withholding material facts from Plaintiffs that

contradicted these representations.

753.    Defendants concealed the illegal defeat device and the true emissions, efficiency,

and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly

diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are

now worth significantly less than  they otherwise would be worth.

754.    Defendants' fraudulent use of the "defeat device" and its concealment of

the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

755.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental

cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram

brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true

value of the Fraudulent Vehicles.

756.    Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate

result of Defendants' misrepresentations and its concealment of and failure to  disclose material

information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have

purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

757.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kansas CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

758.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

759.    As a direct and proximate result of Defendants' violations of the Kansas CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

760.    Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.

761.    Plaintiff also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, et seq.

# KANSAS COUNT 2
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Kan. Stat. §§ 84-2-314 and 84-2A-212)
### (On behalf of the Kansas Plaintiffs)

762. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

763. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

764. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

765. The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

766. A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

767. These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

768. Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others

within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became

public.

769.     As a direct and proximate result of the Defendants' breach of the implied

warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**KANSAS COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Kan. Stat. §§ 84-2-314 and 84-2A-210)**
**(On behalf of the Kansas Plaintiffs)**

770.     Plaintiffs reallege and incorporate by reference all preceding allegations as though

fully set forth herein.

771.     Defendants are and were at all relevant times "merchants" with respect to motor

vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles

under § 84-2-103(1)(d).

772.     With respect to leases, Defendants are and were at all relevant times "lessors" of

motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

773.     The Fraudulent Vehicles are and were at all relevant times "goods" within the

meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

774.     In connection with the purchase or lease of each one of its new vehicles,

Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists

to cover "any repair to correct a manufacturers defect in materials or workmanship."

775.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two

federal emission control warranties: a "Performance Warranty" and a "Design and Defect

Warranty."

776.     The EPA requires vehicle manufacturers to provide a Performance Warranty with

respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its

vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

777.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

778.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

779.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

780.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally

designed and manufactured to be out of compliance   with applicable state and federal emissions laws, and failed to fix the defective emission components   free of charge.

781.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

782.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

783.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

784.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

785.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

786.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

787.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

788.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## KENTUCKY COUNTS

### KENTUCKY COUNT 1
### VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT
(Ky. Rev. Stat. § 367.110, et seq.)
(On behalf of the Kentucky Plaintiffs)

789.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

790.    Defendants and Plaintiffs are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

791.    Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

792.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce

….." Ky. Rev. Stat. § 367.170(1).  Defendants participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

793.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

794.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

795.    Defendants thus violated the Act by, at minimum:  knowingly representing that Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

796.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Kentucky CPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

797.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Kentucky CPA.

798.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

799.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

800.    Defendants knew or should have known that their conduct violated the Kentucky

CPA.

801. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B. intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C. made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

802. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

803. Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

804. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true

value of the Fraudulent Vehicles.

805.   Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

806.   Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Kentucky CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

807.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

808.   As a direct and proximate result of Defendants' violations of the Kentucky CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

809.   Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.

# KENTUCKY COUNT 2
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212)
### (On behalf of Kentucky Plaintiffs)

810.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

811.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

812.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

813.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

814.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

815.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

816.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others

within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

817.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**KENTUCKY COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210)**
**(On behalf of the Kentucky Plaintiffs)**

818.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

819.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

820.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

821.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

822.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

823.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

824.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

825.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

826.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

827.     Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

828.           Plaintiffs experienced defects within the warranty  period. Despite the

existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

829.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

830.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

831.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

832.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

833.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct

as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

834. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

835. Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

836. As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## LOUISIANA COUNTS

### LOUISIANA COUNT 1
### VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (La. Rev. Stat. § 51:1401, *et seq.*)
### (On behalf of the Louisiana Plaintiffs)

837. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

838. Defendants and Plaintiffs, are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

839. Plaintiffs are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

-164-

840.    Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

841.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

842.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

843.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

844.    Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous

-165-

representation when it was not; and knowingly making other false representations in a transaction.

845.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Louisiana CPL by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

846.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Louisiana CPL.

847.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

848.    Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

849.    Defendants knew or should have known that their conduct violated the Louisiana CPL.

-166-

850. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B. intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C. made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

851. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

852. Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

853. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

854.    Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

855.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Louisiana CPL. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

856.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

857.    As a direct and proximate result of Defendants' violations of the Louisiana CPL, Plaintiffs have suffered injury-in-fact and/or actual damage.

858.    Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**LOUISIANA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/**
**WARRANTY AGAINST REDHIBITORY DEFECTS**
**(La. Civ. Code Art. 2520, 2524)**

859.    Defendants are and were at all relevant times merchants with respect to motor vehicles.

860.    A warranty that the Fraudulent Vehicles were in merchantable condition is implied by law in the instant transactions. These Fraudulent Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

861.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant complaint, and by numerous individual letters and communications sent by Plaintiffs and other Plaintiffs before or within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

862.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEVADA COUNTS**

**NEVADA COUNT 1**
**VIOLATIONS OF THE NEVADA DECEPTIVE**
**TRADE PRACTICES ACT**
**(Nev. Rev. Stat. § 598.0903, *et seq*.)**
**(On behalf of the Nevada Plaintiffs)**

863.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

864.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, et seq. prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9.  Advertises goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes any other false representation in a transaction."

865.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass

emission certification tests through   deliberately induced lower-than-real-world emissions readings.

866.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

867.    Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

868.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Nevada DTPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

869.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law   and therefore engaged in conduct that

violates the Nevada DTPA.

870. Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

871. Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

872. Defendants knew or should have known that their conduct violated the Nevada DTPA.

873. Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B. intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C. made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

874. Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

875.    Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

876.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

877.    Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

878.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Nevada DTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

879.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public

interest.

880.    As a direct and proximate result of Defendants' violations of the Nevada DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

881.    Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

### NEVADA COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.R.S. §§ 104.2314 and 104A.2212)
### (On behalf of Nevada Plaintiffs)

882.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

883.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

884.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

885.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

886.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

887.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply

with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

888.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

889.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEVADA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(N.R.S. §§ 104.2313 and 104A.2210)**
**(On behalf of the Nevada Plaintiffs)**

890.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

891.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under 25 § 104.2103(1)(c).

892.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

893.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

894.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

-175-

895.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

896.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

897.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

898.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

899.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

900.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

901.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

902.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

903.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

904.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent

pretenses.

905.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

906.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

907.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

908.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## NEW YORK COUNTS

### NEW YORK COUNT 1
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. Gen. Bus. Law § 349)
### (On behalf of the New York Plaintiffs)

909.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

910.    Plaintiffs and all Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

911.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

912.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.  Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

913.    In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through  deliberately induced lower-than-real-world emissions readings.

914.    Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

915.    Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of

a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

916.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the NY DAPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

917.    The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the NY DAPA.

918.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

919.    Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

920.    Defendants knew or should have known that their conduct violated the NY

-180-

DAPA.

921.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

922.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

923.    Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

924.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and  efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true

value of the Fraudulent Vehicles.

925.    Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

926.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NY DAPA. All owners of Fraudulent Vehicles suffered ascertainable loss in  the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

927.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

928.    As a direct and proximate result of Defendants' violations of the NY DAPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

929.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT 2**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350)**
**(On behalf of the New York Plaintiffs)**

930.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

931.     Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

932.     The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of …representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

933.     Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to Plaintiffs.

934.     Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Fraudulent Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on their CleanDiesel vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Fraudulent Vehicles in order to intentionally and grossly defraud and mislead the Plaintiffs concerning the true emissions produced by the misnamed "CleanDiesel" engines in the Fraudulent Vehicles.

-183-

935.     The misrepresentations and omissions regarding set forth above were material and likely to deceive a reasonable consumer. Specifically, although Defendants advertised the Fraudulent Vehicles as clean and environmentally-friendly, they in fact used a sophisticated defeat device that was undetectable to the ordinary consumer that made them non-compliant with EPA emission regulations.

936.     Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

937.     Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the illegality and true characteristics of Defendants' CleanDiesel vehicles, the quality of the Defendants brand and the true value of the Fraudulent Vehicles.

938.     Defendants' violations of the NY FAA present a continuing risk to Plaintiffs and to the general public. Defendants' deceptive acts and practices affect the public interest.

939.     The Fraudulent Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised. Plaintiffs who purchased Fraudulent Vehicles either would not have purchased them at all or paid less but for Defendants' false advertising in violation of the NY FAA. Plaintiffs who leased Fraudulent Vehicles either would not have leased them at all, or at a lower rate but for Defendants' false advertising in violation of the NY FAA.

940.     The Plaintiffs have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendants' false advertising in violation of the NY FAA, including but not limited to purchasing or leasing an illegal vehicle, diminished or complete lost value for the Fraudulent Vehicles they purchased or leased; lost or diminished use, enjoyment

-184-

and utility of such vehicles; and annoyance, aggravation and inconvenience resulting from Defendant's violations of the NY FAA. Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for Plaintiffs. Because Defendants' conduct was committed willingly and knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000.

### NEW YORK COUNT 3
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. Law §§ 2-314 and 2A-212)
### (On behalf of the New York Plaintiffs)

941. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

942. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

943. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

944. The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

945. A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N N.Y. UCC Law §§ 2- 19  and 2A-212.

946. These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply

with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

947.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

948.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEW YORK COUNT 4**
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. Law §§ 2-313 and 2A-210)**
**(On behalf of the New York Plaintiffs)**

949.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

950.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

951.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

952.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law § 2A-103(1)(p).

953.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

954.     The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

955.     The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

956.     The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

957.     As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

958.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

959.    Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

960.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

961.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

962.    Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

963.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent

pretenses.

964.    Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

965.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

966.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

967.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## NORTH CAROLINA

**NORTH CAROLINA COUNT 1**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR**
**AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, et seq.)**
**(On behalf of the North Carolina Plaintiffs)**

968.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

969.     Plaintiffs are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA").

970.     Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

971.     The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. Gen. Stat. 14 § 75-16.

972.     In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

973.     Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

974.     Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent

Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

975.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the NCUDTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

976.   The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the NCUDTPA.

977.   Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

978.   Defendants intentionally and knowingly misrepresented material facts regarding

the  Fraudulent Vehicles with intent to mislead Plaintiffs.

979.    Defendants knew or should have known that their conduct violated the NCUDTPA.

980.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.    made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

981.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

982.    Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

983.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental

-192-

cleanliness and  efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

984.    Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

985.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the NCUDTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

986.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

987.    As a direct and proximate result of Defendants' violations of the NCUDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

988.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C.

Gen. Stat. § 75-16.

## NORTH CAROLINA COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C.G.S.A. §§ 25-2-314 and 252A-212)
### (On behalf of the North Carolina Plaintiffs)

989.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

990.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under 12 § 25-2-103(1)(d).

991.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

992.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

993.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-314 and N.C.G.S.A. § 25-2A-212.

994.    These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

995.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others

-194-

within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

996. As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NORTH CAROLINA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(N.C.G.S.A. §§ 25-2-313 and 252A-210)**
**(On behalf of the North Carolina Plaintiffs)**

997. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

998. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under 13§ 25-2-103(1)(d).

999. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

1000. The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

1001. In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1002. The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1003. The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its

vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1004.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1005.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1006.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1007.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally

designed and manufactured to be out of compliance   with applicable state and federal emissions laws, and failed to fix the defective emission components   free of charge.

1008.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

1009.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1010.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1011.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

1012.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited

remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1013.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1014.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1015.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## OKLAHOMA COUNTS

### OKLAHOMA COUNT 1
### VIOLATIONS OF OKLAHOMA CONSUMER PROTECTION ACT
**(Okla. Stat. Tit. 15 § 751, et seq.)**

1016.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1017.   Defendants and Plaintiffs are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

1018.   Defendants engaged in "the course of [its] business" within the meaning of Okla. Stat. Tit. 15 § 752.3 with respect to the acts alleged herein. .

1019.   The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to

-198-

know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit. 19 § 753.

1020.  In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through  deliberately induced lower-than-real-world emissions readings.

1021.  Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

1022.  Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous

-199-

representation when it was not; and knowingly making other false representations in a transaction.

1023.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Oklahoma CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1024.  The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Oklahoma CPA.

1025.  Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

1026.  Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

1027.  Defendants knew or should have known that their conduct violated the Oklahoma CPA.

1028.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.      possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.      made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

1029.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

1030.   Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

1031.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

1032.   Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

1033.   Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Oklahoma CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1034.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1035.   As a direct and proximate result of Defendants' violations of the Oklahoma CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

1036.   Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

**OKLAHOMA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Okla. Stat. Tit. 12A §§ 2-314 and 2A-212)**
**(On behalf of the Oklahoma Plaintiffs)**

1037.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1038.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1039.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1040.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1041.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A 13§§ 2-314 and 2A-212.

1042.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1043.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1044.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**OKLAHOMA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Okla. Stat. Tit. 12A §§ 2-313 and 2A-210)**
**(On behalf of the Oklahoma Plaintiffs)**

1045.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1046.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1047.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1048.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1), and 2A-103(1)(h).

1049.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW").  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1050.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1051.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles,

whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1052.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1053.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1054.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1055.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

1056.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles'

materials and workmanship defects.

1057.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1058.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1059.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

1060.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1061.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned

or leased, and for such other incidental and consequential damages as allowed.

1062.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1063.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## TEXAS COUNTS

### TEXAS COUNT 1
### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES
### ACT – CONSUMER PROTECTION ACT
#### (Tex. Bus. & Com. Code §§ 17.41, et seq.)
#### (On behalf of the Texas Plaintiffs)

1064.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1065.   Plaintiffs are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

1066.   Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

1067.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the

-207-

lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

1068.   In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

1069.   Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

1070.   Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

1071.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Texas UTPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by

marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

1072.   The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law  and therefore engaged in conduct that violates the Texas UTPA.

1073.   Defendants knew the true nature of its "clean" diesel engine system, but concealed all of  that information until recently. Defendants were also aware that it valued profits over environmental  cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants  concealed this information as well.

1074.   Defendants intentionally and knowingly misrepresented material facts regarding the  Fraudulent Vehicles with intent to mislead Plaintiffs.

1075.   Defendants knew or should have known that their conduct violated the Texas UTPA.

1076.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety  risks of the Fraudulent Vehicles because they:

A.      possessed exclusive knowledge that they were manufacturing, selling, and  distributing vehicles throughout the United States that did not comply with EPA

regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.      made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

1077.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

1078.   Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

1079.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

1080.   Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been

-210-

disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

1081.   Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Texas UTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1082.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1083.   As a direct and proximate result of Defendants' violations of the Texas UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

1084.   Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

**TEXAS COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tex. Bus. & Com. Code §§ 2.314 and 2A.212)**
**(On behalf of the Texas Plaintiffs)**

1085.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1086.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1087.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1088.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1089.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

1090.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1091.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1092.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**TEXAS COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Tex. Bus. & Com. Code §§ 2.313 and 2A.210)**
**(On behalf of the Texas Plaintiffs)**

1093.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1094.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1095.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1096.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1097.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW").  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1098.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1099.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles,

whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1100.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1101.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1102.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1103.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

1104.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles'

materials and workmanship defects.

1105.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1106.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1107.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

1108.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1109.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned

or leased, and for such other incidental and consequential damages as allowed.

1110.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1111.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## UTAH COUNTS

### UTAH COUNT 1
### VIOLATIONS OF UTAH CONSUMER SALES PRACTICES ACT
(Utah Code Ann. § 13-11-1, et seq.)
(On behalf of the Utah Plaintiffs)

1112.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1113.   Plaintiffs are "persons" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code § 13-11-3(5). The sales and leases of the Fraudulent Vehicles to the Plaintiffs were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

1114.   Defendants are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

1115.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction."  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." Utah Code § 13-11-4. "An unconscionable act or

practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code § 13-11-5.

1116.   In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

1117.   Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

1118.   Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

1119.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Utah CSPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by

marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and

by presenting itself  as a reputable manufacturer that valued environmental cleanliness and

efficiency, and that stood behind  its vehicles after they were sold.

1120.   The Clean Air Act and EPA regulations require that automobiles limit their

emissions  output to specified levels. These laws are intended for the protection of public health

and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited

by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By

installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles

available for purchase, Defendants violated federal law  and therefore engaged in conduct that

violates the Utah CSPA.

1121.   Defendants knew the true nature of its "clean" diesel engine system, but concealed

all of  that information until recently. Defendants were also aware that it valued profits over

environmental  cleanliness, efficiency, and compliance with the law, and that it was

manufacturing, selling, and  distributing vehicles throughout the United States that did not

comply with EPA regulations. Defendants  concealed this information as well.

1122.   Defendants intentionally and knowingly misrepresented material facts regarding

the  Fraudulent Vehicles with intent to mislead Plaintiffs.

1123.   Defendants knew or should have known that their conduct violated the Utah

CSPA.

1124.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and

safety  risks of the Fraudulent Vehicles because they:

A.      possessed exclusive knowledge that they were manufacturing, selling,

and  distributing vehicles throughout the United States that did not comply with EPA

regulations;

B.     intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.     made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1125.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

1126.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

1127.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

1128.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been

disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid

significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as

lost or diminished  use.

1129.   Defendants had an ongoing duty to all their customers to refrain from unfair and

deceptive practices under the Utah CSPA. All owners of Fraudulent Vehicles suffered

ascertainable loss in  the form of the diminished value of their vehicles as a result of Defendants'

deceptive and unfair acts and practices made in the course of Defendants' business.

1130.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

general  public. Defendants' unlawful acts and practices complained of herein affect the public

interest.

1131.   As a direct and proximate result of Defendants' violations of the Utah CSPA,

Plaintiffs have suffered injury-in-fact and/or actual damage.

1132.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

general public. Defendants' unlawful acts and practices complained of herein affect the public

interest.

1133.   Plaintiffs seeks all relief to which they are entitled under the Utah CSPA.

## UTAH COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Utah Code §§ 70A-2-314 and 70A-2A-212)
#### (On behalf of the Utah Plaintiffs)

1134.   Plaintiffs reallege and incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

1135.   Defendants are and were at all relevant times "merchants" with respect to motor

vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles

under § 70A-2-103(1)(d).

1136.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

1137.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1138.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

1139.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1140.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1141.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**UTAH COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Utah Code §§ 70A-2-313 and 70A-2A-210)**
**(On behalf of the Utah Plaintiffs)**

1142.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1143.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

1144.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

1145.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1146.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW").  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1147.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1148.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1149.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1150.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1151.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1152.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

1153.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

1154.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient

to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1155.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1156.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

1157.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1158.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1159.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat

Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent

Vehicles to evade clean air standards.

1160.   As a direct and proximate result of Defendants' breach of express warranties,

Plaintiffs have been damaged in an amount to be determined at trial.

## **VIRGINIA COUNTS**

### **VIRGINIA COUNT 1**
### **VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
### **(Va. Code Ann. §§ 59.1-196, et seq.)**
### **(On behalf of the Virginia Plaintiffs**

1161.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

1162.   Defendants and Plaintiffs are "persons" within the meaning of Va. Code § 59.1-

198.

1163.   Defendants are "supplier[s]" within the meaning of Va. Code § 59.1-198.

1164.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful

"fraudulent acts or practices." Va. Code § 59.1-200(A).

1165.   In the course of their business, Defendants concealed and suppressed material facts

concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that

enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and

global  warming—to pass EPA emissions testing while at the same time disabling the same controls

during real-  world driving. Specifically, the software was designed to cheat emission testing by

showing lower  emissions during laboratory testing conditions then actually existed when the

vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to pass

emission certification tests through  deliberately induced lower-than-real-world emissions

readings.

1166.   Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

1167.   Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

1168.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Virginia CPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

1169.   The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law   and therefore engaged in conduct that violates the Virginia CPA.

1170.   Defendants knew the true nature of its "clean" diesel engine system, but concealed

all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

1171.   Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

1172.   Defendants knew or should have known that their conduct violated the Virginia CPA.

1173.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.   intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1174.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are

now worth significantly less than  they otherwise would be worth.

1175.   Defendants' fraudulent use of the "defeat device" and its concealment of

the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

1176.   Defendants' unfair or deceptive acts or practices were likely to and did in fact

deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental

cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram

brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true

value of the Fraudulent Vehicles.

1177.   Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate

result of Defendants' misrepresentations and its concealment of and failure to  disclose material

information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have

purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been

disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid

significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as

lost or diminished  use.

1178.   Defendants had an ongoing duty to all their customers to refrain from unfair and

deceptive practices under the Virginia CPA. All owners of Fraudulent Vehicles suffered

ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants'

deceptive and unfair acts and practices made in the course of Defendants' business.

1179.   Defendants' violations present a continuing risk to Plaintiffs as well as to the

general  public. Defendants' unlawful acts and practices complained of herein affect the public

interest.

1180.   As a direct and proximate result of Defendants' violations of the Virginia CPA,

Plaintiffs have suffered injury-in-fact and/or actual damage.

1181.   Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiffs are entitled to the greater of actual damages or $500 for each Plaintiff, attorneys' fees, and costs. Because Defendants' actions were willful, Plaintiffs should each receive the greater of treble damages or $1,000. *Id.*

### VIRGINIA COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Va. Code §§ 8.2-314 and 8.2A-212)
### (Breach of Implied Warranty)

1182.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1183.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor  vehicles under § 8.2-103(1)(d).

1184.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

1185.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1186.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

1187.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1188.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1189.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**VIRGINIA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Va. Code §§ 8.2-313 and 8.2A-210)**
**(On behalf of the Virginia Plaintiffs)**

1190.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1191.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

1192.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1193.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW").  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1194.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

-230-

1195.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1196.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1197.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1198.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1199.   Plaintiffs experienced defects within the warranty period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

1200.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

1201.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1202.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1203.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

1204.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and

consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1205.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1206.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1207.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## WASHINGTON COUNTS

### WASHINGTON COUNT 1
### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
**(Wash. Rev. Code Ann. §§ 19.86.010, et seq.)**
**(On behalf of the Washington Plaintiffs)**

1208.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1209.   Defendants and Plaintiff are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

1210.   Defendants are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

1211.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

1212.   In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower   emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through    deliberately induced lower-than-real-world emissions readings.

1213.   Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

1214.   Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

1215.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Washington CPA by installing, failing to disclose and actively concealing the illegal

defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1216.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Washington CPA.

1217.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

1218.    Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

1219.    Defendants knew or should have known that their conduct violated the Washington CPA.

1220.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling,

-235-

and  distributing vehicles throughout the United States that did not comply with EPA regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.      made incomplete representations about the environmental cleanliness and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while  purposefully withholding material facts from Plaintiffs that contradicted these representations.

1221.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

1222.   Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

1223.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

1224.   Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have

purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1225.   Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Washington CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in  the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1226.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1227.   As a direct and proximate result of Defendants' violations of the Washington CPA,  Plaintiffs have suffered injury-in-fact and/or actual damage.

1228.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs seek an order enjoining Defendants's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled. *Id.*

## WASHINGTON COUNT 2
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212)
### (On behalf of the Washington Plaintiffs)

1229.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1230.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1231.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1232.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1233.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

1234.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1235.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1236.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**WASHINGTON COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210)**
**(On behalf of the Washington Plaintiffs)**

1237.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1238.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1239.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1240.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1241.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1242.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1243.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles,

-239-

whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1244.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1245.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1246.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1247.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

1248.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles'

materials and workmanship defects.

1249.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1250.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1251.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent pretenses.

1252.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1253.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned

or leased, and for such other incidental and consequential damages as allowed.

1254.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1255.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

**WASHINGTON COUNT 4**
**WASHINGTON LEMON LAW**
**(Wash. Rev. Code § 19.118.005, et al.)**
**(On behalf of the Washington Plaintiffs)**

1256.   Plaintiff own or lease "new motor vehicles" within the  meaning of Wash. Rev. Code § 19.118.021(12), because these vehicles are self-propelled primarily designed for the transportation of persons or property over the public highways and were originally purchased or leased at retail from a new motor vehicle dealer or leasing company in Washington. These vehicles do not include vehicles purchased or leased by a business as part of a fleet of ten or more vehicles at one time or under a single purchase or lease agreement or those portions of a motor home designated, used, or maintained primarily as a mobile dwelling, office, or commercial space.

1257.   Defendants are "manufacturer[s]" of the Fraudulent Vehicles within the meaning of Wash. Rev. Code § 19.118.021(8) because it is in the business of constructing or assembling new motor vehicles or is engaged in the business of importing new motor vehicles into the United States for the purpose of selling or distributing new motor vehicles to new motor vehicle dealers.

1258.   Plaintiffs are "consumers" within the meaning of Wash. Rev. Code § 19.118.021(4) because they entered into an agreement or contract for the transfer, lease, or purchase of a new motor vehicle, other than for purposes of resale or sublease, during the eligibility period as defined by Wash. Rev. Code § 19.118.021(6). 3324.   The Fraudulent Vehicles did not conform to their warranties as defined by Wash. Rev. Code § 19.118.021(22), during the "eligibility period," defined by Wash. Rev. Code § 19.118.021(6), or the coverage period under the applicable written warranty because they were not cleaner vehicles and contained a "defeat device" designed to circumvent state and federal emissions standards. Wash. Rev. Code § 19.118.031. These devices did in fact circumvent emissions standards and substantially impaired the use, market value, and safety of their motor vehicles.

1259.   Defendants had actual knowledge of the conformities during warranty periods. But the nonconformities continued to exist throughout this term, as they have not been fixed.

1260.   Plaintiffs are excused from notifying Defendants of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

1261.   Defendants has had a reasonable opportunity to cure the nonconformities because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Wash. Rev. Code § 19.118.031.

1262.   For vehicles purchased, Plaintiffs demand a full refund of the contract price, all collateral charges, and incidental costs. Wash. Rev. Code § 19.118.041(1)(b).  For vehicles leased, Plaintiffs demand all payments made under the lease including but not limited to all lease payments, trade-in value or inception payment, security deposit, and all collateral charges and incidental costs. The consumer is also relieved of any future obligation to the lessor or lienholder.

Id. Plaintiffs reject an offer of replacement and will retain their vehicles until payment is tendered.

## WISCONSIN

**WISCONSIN COUNT 1**
**VIOLATIONS OF THE WISCONSIN**
**DECEPTIVE TRADE PRACTICES ACT**
**(Wis. Stat. § 100.18)**
**(On behalf of the Wisconsin Plaintiffs)**

1263.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1264.   Plaintiffs are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiffs purchased or leased one or more Fraudulent Vehicles.

1265.   Plaintiffs are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

1266.   Defendants are a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

1267.   The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

1268.   In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the  road. This deceptive practice enabled Defendants' vehicles to

-244-

pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

1269.   Plaintiffs had no way of discerning that Defendants' representations  were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception  on their own.

1270.   Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

1271.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Wisconsin DTPA by installing, failing to disclose and actively concealing the illegal defeat  device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its  vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself  as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind  its vehicles after they were sold.

1272.   The Clean Air Act and EPA regulations require that automobiles limit their emissions  output to specified levels. These laws are intended for the protection of public health and welfare.  "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its  regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in  the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law   and therefore engaged in conduct that

violates the Wisconsin DTPA.

1273.   Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

1274.   Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

1275.   Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

1276.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Fraudulent Vehicles because they:

A.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs; and/or

C.      made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1277.   Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than  they otherwise would be worth.

1278.   Defendants' fraudulent use of the "defeat device" and its concealment of the true  characteristics of the "clean" diesel engine system were material to Plaintiffs.

1279.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive  regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and   efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of  environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

1280.   Plaintiffs suffered ascertainable loss and actual damages as a  direct and proximate result of Defendants' misrepresentations and its concealment of and failure to  disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature  had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly  less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished  use.

1281.   Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Wisconsin DTPA. All owners of Fraudulent Vehicles suffered ascertainable loss in   the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1282.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general  public. Defendants' unlawful acts and practices complained of herein affect the public

-247-

interest.

1283.   As a direct and proximate result of Defendants' violations of the Wisconsin DTPA,  Plaintiffs have suffered injury-in-fact and/or actual damage.

1284.   Plaintiffs seek damages, court costs and attorneys' fees under Wis. Stat. § 00.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**WISCONSIN COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Wis. Stat. §§ 402.314 and 411.212)**
**(On behalf of the Wisconsin Plaintiffs)**

1285.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1286.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1287.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1288.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1289.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N Wis. Stat. §§ 402.314 and 411.212.

1290.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply

with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

1291.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1292.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**WISCONSIN COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Wis. Stat. §§ 402.313 and 411.210)**
**(On behalf of the Wisconsin Plaintiffs)**

1293.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1294.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1295.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1296.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1297.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1298.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1299.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1300.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1301.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1302.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs   and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1303.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance   with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

1304.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

1305.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1306.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1307.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent

pretenses.

1308.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1309.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1310.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1311.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## WYOMING COUNTS

### WYOMING COUNT 1
### VIOLATIONS OF THE WYOMING CONSUMER PROTECTION ACT
### (Wyo. Stat. §§ 40-12-101, et seq.)
### (On behalf of the Wyoming Plaintiffs)

1312.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1313.   Plaintiffs and Defendants are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

1314.   The Fraudulent Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a).

1315.   Each sale or lease of a Fraudulent Vehicle to a Plaintiff was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [Defendants'] business" under Wyo. Stat. § 40-12-105(a).  Plaintiffs purchased or leased one or more Fraudulent Vehicles.

1316.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits unlawful deceptive trade practices, including when a seller: "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or practices." Wyo. Stat. §§ 40-12-105(a).

1317.   In the course of their business, Defendants concealed and suppressed material facts concerning the Fraudulent Vehicles. The Defendants installed software in their vehicles that enabled  emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global  warming—to pass EPA emissions testing while at the same time disabling the same controls during real-  world driving. Specifically, the software was designed to cheat emission testing by showing lower  emissions during laboratory testing conditions then actually existed when the vehicle operated on the   road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through   deliberately induced lower-than-real-world emissions readings.

1318.   Plaintiffs had no way of discerning that Defendants' representations  were false

-253-

and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception on their own.

1319.   Defendants thus violated the Act by, at minimum:  knowingly representing that the Fraudulent Vehicles have uses and benefits which they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; advertising Fraudulent Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Fraudulent Vehicles has been supplied in accordance with a previous representation when it was not; and knowingly making other false representations in a transaction.

1320.   Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Wyoming CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

1321.   The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Fraudulent Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Fraudulent Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Wyoming CPA.

1322.   Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over

-254-

environmental  cleanliness, efficiency, and compliance with the law, and that it was

manufacturing, selling, and  distributing vehicles throughout the United States that did not

comply with EPA regulations. Defendants  concealed this information as well.

1323.   Defendants intentionally and knowingly misrepresented material facts regarding

the  Fraudulent Vehicles with intent to mislead Plaintiffs.

1324.   Defendants knew or should have known that their conduct violated the Wyoming

CPA.

1325.   Defendants owed Plaintiffs a duty to disclose the illegality and public health and

safety  risks of the Fraudulent Vehicles because they:

A.      possessed exclusive knowledge that they were manufacturing, selling,

and  distributing vehicles throughout the United States that did not comply with EPA

regulations;

B.      intentionally concealed the foregoing from regulators and Plaintiffs;

and/or

C.      made incomplete representations about the environmental cleanliness

and  efficiency of the Fraudulent Vehicles generally, and the use of the defeat device

in particular, while  purposefully withholding material facts from Plaintiffs that

contradicted these representations.

1326.   Defendants concealed the illegal defeat device and the true emissions, efficiency,

and  performance of the "clean" diesel system, resulting in a raft of negative publicity once the

defects finally  began to be disclosed. The value of the Fraudulent Vehicles has therefore greatly

diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are

now worth significantly less than  they otherwise would be worth.

1327.   Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.

1328.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Fraudulent Vehicles.

1329.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1330.   Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Wyoming CPA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

1331.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1332.   As a direct and proximate result of Defendants' violations of the Wyoming CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

1333.   Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

**WYOMING COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212)**
**(On behalf of the Wyoming Plaintiffs)**

1334.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1335.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1336.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1337.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1338.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2- 17 and 34.1-2.A-212.

1339.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

-257-

1340.   Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

1341.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**WYOMING COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Wyo. Stat. § 34.1-2-313)**

1342.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1343.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1344.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1345.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1346.   In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

1347.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

1348.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

1349.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1350.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

1351.   Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs  and purchased or leased their Fraudulent Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

1352.   Plaintiffs experienced defects within the warranty  period. Despite the existence of warranties, Defendants failed to inform Plaintiffs that the Fraudulent Vehicles were intentionally designed and manufactured to be out of compliance  with applicable state and federal emissions laws, and failed to fix the defective emission components  free of charge.

1353.   Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Fraudulent Vehicles' materials and workmanship defects.

1354.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1355.   Accordingly, recovery by Plaintiffs is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs seek all remedies as allowed by law.

1356.   Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Fraudulent Vehicles, they knew that the Fraudulent Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Fraudulent Vehicles. Plaintiffs were therefore induced to purchase or lease the Fraudulent Vehicles under false and/or fraudulent

pretenses.

1357.   Moreover, many of the injuries flowing from the Fraudulent Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' remedies would be insufficient to make Plaintiffs.

1358.   Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs of the purchase or lease price of all Fraudulent Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

1359.   Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Fraudulent Vehicles to evade clean air standards.

1360.   As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## X.  REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.      An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

B.  Injunctive relief in the form of a recall or free replacement;

C.  A declaration that the defeat device software in the Fraudulent Vehicles is illegal and that the Fraudulent Vehicles are defective;

D.  Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

E.  Rescission of the Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Vehicles, including taxes, licenses, and other fees;

F.  Damages under the Magnuson-Moss Warranty Act and the RICO statute;

G.  For treble and/or punitive damages as permitted by applicable laws;

H.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.  An award of costs and attorneys' fees; and

J.  Such other or further relief as the Court may deem appropriate, just, and equitable.

## XI.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

**DATED:**  May 5, 2017.

HEYGOOD, ORR & PEARSON


By: /s/ *Charles Miller*
CHARLES MILLER,
ESQ./SBN: 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161,
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

Admission *Pro Hac Vice*
to be Sought for:

MICHAEL E. HEYGOOD,
Texas Bar No. 00784267
ERIC D. PEARSON,
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161,
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorney for Plaintiffs**